UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN GARCIA, | No. 1:07-CV-00867-OWW-DLB |
| Plaintiff, | MEMORANDUM DECISION RE |
| v. | DEFENDANT ALFREDO CARDWOOD'S MOTION FOR SUMMARY JUDGMENT |
| CITY OF MERCED, CITY OF MERCED POLICE DEPARTMENT, BUREAU OF NARCOTICS ENFORCEMENT SPECIAL AGENT SUPERVISOR ALFREDO CARDWOOD, et al., | OR PARTIAL ADJUDICATION (Doc. 58) |
| Defendant. | |

I.    INTRODUCTION.

Plaintiff John Garcia, an attorney, brings this action under 42 U.S.C. § 1983 for violation of his Fourth Amendment rights. His suit arises from, but is not limited to, a warrant that was executed on February 6, 2006 for the search of his law office in Merced, California. The warrant culminated the Merced Multi-Agency Narcotic Task Force's investigation into allegations that John Garcia was smuggling narcotics into the Merced County Jail. Based on information from Robert Plunkett, an inmate at Merced County Jail, the Task Force conducted a "reverse sting" operation whereby Task Force Agents observed Plaintiff receive, inspect, and transport approximately fourteen grams of methamphetamine Plunkett offered to Plaintiff. Following the sting, Task Force Agents obtained a warrant to search 655 West Nineteenth Street, Merced, California, the law offices of John Garcia. The warrant was based on the oral affidavit of Deputy Sheriff John Taylor and Special

1   Agent Alfredo Cardwood and was authorized by Judge Frank Dougherty
2   of the Merced Superior Court.

3       On March 13, 2007, Plaintiff filed a Complaint against
4   Defendants City of Merced; City of Merced Police Department;[1]
5   California Bureau of Narcotics Enforcement Special Agent Alfredo
6   Cardwood ("Cardwood"); County of Merced; Merced County Sheriff's
7   Department; Merced County Deputy Sheriff John Taylor ("Taylor");
8   Merced County District Attorney's Office; and Merced County
9   District Attorney Gordon Spencer ("Spencer").  Agent Cardwood and
10  Deputy Taylor are sued in their individual capacities.  The County
11  of Merced is sued as a municipal entity that acts by and through
12  its individual deputies.

13      The First Cause of Action alleges assault against all
14  Defendants; the Second Cause of Action alleges battery against all
15  Defendants; the Third Cause of Action alleges false arrest and
16  imprisonment with a warrant against all Defendants; the Fourth
17  Cause of Action alleges defamation by slander against Cardwood;[2]
18  the Fifth Cause of Action alleges a violation of Title 42, United
19  States Code, Section 1983 against all Defendants.[3]

20      Before the court for decision is Cardwood's motion for summary

21

22      [1] City of Merced and City of Merced Police Department were
    dismissed pursuant to stipulation (F.R.C.P. 41(a)) on June 17,
23  2009.  (Doc. 70.)

24      [2] Plaintiff's claim for defamation against Cardwood was
    previously dismissed.  (Doc. 73, 2:6-2:9.)
25

26      [3] The motion for summary judgment filed by Defendants County
    of Merced; Merced County Sheriff's Department; Merced County Deputy
27  Sheriff John Taylor; Merced County District Attorney's Office; and
    Merced County District Attorney Gordon Spencer is resolved by
28  separate Memorandum Decision.

judgment or, in the alternative, summary adjudication.  Cardwood is a Special Agent for the California Department of Justice, Bureau of Narcotic Enforcement.

## II.    FACTUAL BACKGROUND.[4]

Plaintiff is an experienced criminal defense attorney.  For the past twenty years, Plaintiff represented criminal defendants in Merced County, including Alfonso Robledo, an inmate at Merced County Jail in early 2006.

Defendant Alfredo Cardwood is a special agent with the State of California Department of Justice, Bureau of Narcotics Enforcement ("BNE").  The BNE has nine regional offices and numerous regional task forces located throughout California, including the Merced Multi-Agency Narcotic Task Force.  Special Agent Cardwood was the supervising agent in charge of the Merced Multi-Agency Narcotic Task Force.  (Cardwood Dec. ¶ 4.)

Defendant County of Merced is a public entity organized under California law.  Merced County Sheriff's Department is a department of the County of Merced, with the responsibility to maintain and administer law enforcement in Merced County.  Defendant John Taylor is a deputy with the Merced County Sheriff's Department, who acted as the Task Force's primary case agent.

Defendant Merced County District Attorney's Office was

_____

[4] Unless otherwise noted, the facts herein are undisputed. (See Def.'s Stmt. of Undisp. Facts in Supp. of Summ. J. ("SUF"), Doc. 58-5, filed May 5, 2009).  Plaintiff filed objections to certain items of Defendant's evidence.  Except where otherwise noted, such evidence is immaterial to the court's analysis of Defendant's motion or the objections are without merit.

3

1    established by the Constitution of the State of California,

2    Government Code Section 26500, to provide prosecution and

3    enforcement services in adult and juvenile criminal matters for

4    Merced County.    At all relevant times, Gordon Spencer was the

5    District Attorney for Merced County.

6        In early 2006, Doug Jensen, Commander of the Merced County

7    Sheriff's Department, contacted Deputy Taylor with information

8    about a contraband smuggling operation at the County Jail. (Taylor

9    Dep. 11:12-11:22.)  Jensen told Taylor that an inmate named Robert

10   Plunkett ("Plunkett"), told one of his Sergeants, Sergeant Pace,

11   that a local attorney was smuggling contraband into the jail. (Id.

12   at 11:23-11:25.)  Plunkett told Sergeant Pace that the smuggling

13   operation involved an attorney named "John Garcia."   (Id.)

14       Deputy Taylor began a formal investigation into the smuggling

15   operation, without apprising Garcia of the events and occurrences

16   related to his investigation.  (Cardwood Dec. 4.)  Deputy Taylor

17   interviewed Plunkett multiple times in late January and early

18   February.    Plunkett informed Taylor that Alfonso Robledo

19   ("Robledo"), a fellow inmate at Merced County Jail, told him that

20   he obtained drugs through his attorney, John Garcia.  According to

21   Plunkett (via Robledo), Garcia would bring the drugs to their

22   attorney-client meetings, disguised in a Bugler cigarette package.

23   Garcia would give the Bugler package containing the drugs to

24   Robledo, who would return to his cell with the Bugler package.

25   According to Taylor, Plaintiff's versions of the smuggling ring

26   were consistent.

27       Taylor met with Plunkett between three and ten additional

28   times over the next twenty days.  Plunkett provided further details

**4**

of the alleged smuggling, including that certain nonviolent offenders smuggled contraband into the Jail while on a "pass" from the facility.  (SUF 14.)  These individuals would obtain the contraband and either place it in one of their body cavities and/or hand it off to Garcia, who would bring it into the Jail at a later date.  (SUF 14.)  Plunkett also told Taylor that the alleged members of the smuggling ring included Robledo, Garcia, Sylvia Brown, a friend of Robledo's, and two private investigators working for Garcia, Augustine Provencio and Greg Hassen.

Deputy Taylor sought corroboration for Plunkett's statements concerning the smuggling ring, including the identities of the alleged participants and the basis for Plunkett's knowledge. Deputy Taylor researched jail records and confirmed that inmate Robledo was in custody at the Merced County Jail on various drug-related offenses and that Robledo and Plunkett shared a housing unit.  (SUF 18-19.)  Deputy Taylor also checked John Garcia's criminal record, confirming that Garcia had a history of drug-related violations.  (SUF 20.)

Deputy Taylor checked for Plunkett's name in a computer database of unreliable informants, maintained by narcotics officers who were given unreliable tips.  Plunkett's name was not in the database.  Deputy Taylor also discovered Sylvia Brown's phone number in one of Robledo's previous bookings.  According to Taylor, Plunkett's information was credible.  Agent Cardwood was familiar with the steps Deputy Taylor took to build the case.  (Cardwood Dec. ¶ 4.)

The Task Force then planned a reverse-sting operation to confirm Plunkett's statements and determine whether or not Garcia

5

1  was smuggling contraband into the Jail.   In early February 2006,
2  Agent Taylor obtained methamphetamine from the Merced County
3  evidence department for the reverse-sting operation.   After the
4  Court granted the order to obtain the methamphetamine, it was
5  placed in a Bugler brand cigarette package.   (Cardwood Dec. ¶ 5.)
6  According to Taylor and Cardwood, the methamphetamine was clearly
7  visible upon opening the Bugler package.   (Cardwood Dec. ¶ 5.)

8      On February 6, 2006, Agent Taylor and another Task Force Agent
9  met with Plunkett, searched his person for illegal contraband or
10 narcotics, and upon finding none, the officers gave Plunkett the
11 methamphetamine.   Plunkett was fitted with both a "wire" and a
12 digital recorder.   The sting operation required Plaintiff to
13 contact John Garcia at the Merced County Superior Courthouse,
14 giving him the Bugler tobacco pouch.   Plunkett would tell Garcia
15 that he was on a "pass" from Sandy Mush Correctional Facility and
16 that the package was for Robledo.   Agent Cardwood personally
17 monitored the wire during the reverse-sting operation.[5] (SUF 32.)
18 In addition to audio surveillance, Agent Cardwood was stationed in
19 a vehicle near Plaintiff's office and had a clear view to monitor
20 the interaction between Plaintiff and Plunkett. (Cardwood Dec. ¶
21 6.)

22     Plunkett proceeded to the Merced County Superior Court and
23 approached John Garcia in one of the courtrooms.   Plunkett told him
24 that he was a friend of one of Garcia's clients, Alfredo Robledo.
25 Plaintiff gave Plunkett a business card and told him to contact his

26

27     [5] According to Cardwood, the transmission was of poor-quality,
28 making it difficult to hear the parties. (Cardwood Dec. ¶ 6.)

6

1  office.   Plunkett then left the courtroom.

2      Approximately one hour later, Plunkett approached Garcia
3  outside the courtroom and told him he had a package for Garcia.
4  Plaintiff instructed Pluckett to drop it off at his office.   Garcia
5  then went back inside the courtroom.   A short time later, Pluckett
6  approached Garcia outside the courthouse, telling him that he could
7  not locate his office.   As they walked toward Garcia's office,
8  Plunkett told Garcia that he was on an afternoon pass from Sandy
9  Mush and knew Robledo.   Plunkett then produced the Bugler tobacco
10  pouch containing the methamphetamine and handed it to Garcia.   (SUF
11  31.)   Garcia took the Bugler tobacco pouch from Pluckett and
12  continued walking to his office.   (SUF 31, 33, 37.)   Plaintiff
13  possessed the Bugler package containing the methamphetamine when he
14  entered his office building.   (SUF 38.)

15      The record reflects considerable dispute over whether Garcia
16  opened the Bugler package while he and Pluckett were walking to
17  Garcia's office.   Agent Cardwood maintains that Plaintiff opened
18  the Bugler package, looked inside, closed the package, and walked
19  to his office.   (SUF 34, 35.)   Cardwood declares that the
20  methamphetamine was directly underneath the flap, clearly visible
21  to anyone who opened it.   (SUF 36;)   Agent Carlisle and Plunkett
22  also observed Garcia look inside the tobacco pouch during the
23  exchange.   (Taylor Dec. ¶ 22.)

24      According to Plaintiff, he told Pluckett that, "if there's
25  anything in here besides tobacco, you take it back to Sylvia or
26  wherever you got it."   Plaintiff maintains that he did not open the
27  tobacco pouch during the exchange nor did he open it while walking
28  to his office.

1   When Plaintiff and Plunkett arrived at the office, Plaintiff
2   placed the Bulger package on his secretary's desk.   Plaintiff's
3   investigator, Provencio, was present in the office.   Plunkett
4   stayed in the office only a few moments before leaving.   He
5   contacted Agent Taylor and told him that Plaintiff took the Bugler
6   pouch into the office and handed it to his secretary.   (Taylor Dec.
7   ¶ 21.)

8   Plaintiff's other investigator, Hassen, arrived shortly after
9   Plunkett left.   Garcia and his investigators opened the tobacco
10  pouch, discovering the methamphetamine.   Garcia then instructed
11  Provencio to flush the methamphetamine down the toilet.   Provencio
12  did so and then discarded the bag into the bathroom trash can.
13  Garcia then left his office in a black Volvo.

14  After driving one mile, Garcia's Volvo was stopped by a City
15  of Merced Police patrol vehicle.   (SUF 39.)   A total of three
16  officers, including Cardwood, were present when Plaintiff was
17  stopped leaving his office.   (Cardwood Dec. ¶ 10.)  Agent Cardwood
18  approached Garcia's stopped vehicle, directing him to exit the
19  vehicle and proceed to the sidewalk.   (Cardwood Dec. ¶ 10.)
20  Plaintiff was handcuffed and searched. (SUF 40.)   Plaintiff was
21  then transported back to his office for questioning.   (SUF 41.)
22  Plaintiff's office was "frozen" pending the issuance of a search
23  warrant, ensuring that no one entered or exited the building.

24  Garcia was not threatened during the vehicle stop and there
25  was no physical contact other than the brief search.   At no time
26  did the Task Force Agents tell Plaintiff he was under arrest.   The
27  entire stop took less than half an hour.

28  While Plaintiff was transported back to his office, Agent

**8**

Cardwood and Deputy Taylor sought a search warrant from Superior Court Judge Frank Dougherty. (SUF 41-42.)   In a verbal search warrant application, under penalty of perjury, Cardwood and Agent Taylor testified to the investigation and their observations during the reverse-sting operation. (Id.)  Judge Dougherty found probable cause to issue the search warrant based on the fact that Plaintiff had taken possession of the methamphetamine. (Id.)   The search warrant authorized a search of Plaintiff, Plaintiff's vehicle and Plaintiff's office to allow, in part, the recovery of the methamphetamine. (Id.)   Judge Dougherty appointed a Special Master, Gerald Brunn, to be present during the search.[6]

Plaintiff's allegations focus on Agent Cardwood's and Deputy Taylor's alleged misrepresentations and omissions to Judge Dougherty supporting Deputy Taylor's Oral Affidavit.  According to Plaintiff, Agent Cardwood's observation that Garcia opened the bugler pouch is a total fabrication.  Plaintiff maintains that while he accepted the Bugler pouch from Plunkett, he did not open the flap.  Plaintiff also accuses Deputy Taylor of misrepresenting and omitting material facts, specifically, omitting Mr. Plunkett's extensive criminal history, bearing on his credibility.  Agent Cardwood and Deputy Taylor maintain that all of the information they provided to Judge Dougherty on February 6, 2006 was accurate and true.  (Taylor Dec. ¶ 24; Cardwood Dec. ¶ 14.)

The search of Garcia's office revealed a plastic baggie containing a small amount of methamphetamine in the bathroom area

---

[6] The search did not commence until Specal Master Brunn arrived.  Defendants provided Garcia's staff with dinner while waiting for Special Master Brunn to arrive.

and a small amount of methamphetamine residue in the main office. (SUF 45.)   Six packages of "Bugler" brand tobacco and one ziplock bag of tobacco were found in the top drawer of Garcia's desk. (SUF 45.)   A one pound scale, similar to the kind used to weigh drugs, was found on Garcia's desk.[7]   (SUF 45.)

Following the search, Agent Cardwood and Deputy Taylor removed Garcia's handcuffs and advised him of his Miranda rights.   (SUF 48.)   Cardwood and Taylor interviewed Garcia for approximately one hour.[8]   (SUF 49.)   Garcia was then released.   (SUF 49.)   Garcia was not arrested, charged, or prosecuted in connection with the criminal investigation.   (SUF 50-52.)

### III. PROCEDURAL HISTORY.

On March 13, 2007, Plaintiff filed a complaint in the Superior Court, County of Merced, against the County of Merced, Merced County Sheriff's Department, Deputy Taylor, District Attorney Gordon Spencer, Special Agent Cardwood, City of Merced, and Merced City Police Department.[9]   Plaintiff alleged defendants were liable under state law theories of assault, abuse of process, and defamation by slander.

Plaintiff filed his first amended complaint on March 21, 2007,

---

[7]   Plaintiff was detained in his office during the search, but was not arrested.   He was permitted to use the restroom and was not threatened or mistreated during his detention.

[8]   Plunkett consented to wearing a wire and recording the conversation.

[9]   Defendants City of Merced and City of Merced Police Department were dismissed on June 17, 2009.   (Doc. 70.)

his second amended complaint on April 5, 2007, and his third amended complaint on May 23, 2007. Unlike his previous complaints, Garcia's third amended complaint included a cause of action for violation of federal civil rights pursuant to 42 U.S.C. 1983. On June 15, 2007, the case was removed to federal court.[10] (Doc 1.)

On August 20, 2007, Plaintiff filed a Fourth Amended Complaint against Defendants. Plaintiff alleged defendants were liable under 42 U.S.C. 1983 for unreasonable search and seizure (Count V); under the California Constitution for unlawful search and seizure (Count VI); and state law claims for assault and battery, false arrest and imprisonment, abuse of process, and defamation by slander (Counts I-IV). Agent Cardwood and Deputy Taylor were sued

---

[10] Plaintiff filed his original complaint in the Superior Court of Merced on March 13, 2007. Plaintiff then amended his complaint and filed his First Amended Complaint on March 21, 2007 to substitute real names for fictitious "Doe" defendants. Plaintiff filed yet another amended complaint, his Second Amended Complaint on April 5, 2007, pursuant to an *ex parte* application before Defendants Merced and Merced Police could file a demurrer on the first amended complaint, which they claim they were preparing. Defendants Merced, Merced Police and Merced County timely filed demurrers against the Second Amended Complaint, and a hearing was set for May 31, 2007. Plaintiff filed yet another amended complaint, a Third Amended Complaint on May 23, 2007. The Superior Court of Merced permitted the hearing on the demurrer to the Second Amended Complaint go forward despite the filing of the Third Amended Complaint. At the hearing the Court stated that it would allow the Third Amended Complaint but would allow no further amendments until Defendants have had the opportunity to test the sufficiency of the new complaint's allegations. The Third Amended Complaint contained a federal cause of action pursuant to 42 U.S.C § 1983 and, Defendants removed the action to Federal Court. Defendants then timely filed a motion to dismiss the Third Amended Complaint on June 19, 2007. Plaintiff filed his Fourth Amended Complaint on August 20, 2007. Defendants Merced and Merced Police then sought relief from the Court by their filing on August 28, 2007.

1 in their individual capacities and the County of Merced was sued as

2 a municipal entity that acts by and through its individual

3 deputies.  (Doc. 15.)

4       Defendants Merced County, Sheriff's Dept., Taylor and Spencer

5 filed their supplemental brief on the motion to dismiss the Fourth

6 Amended Complaint on September 4, 2007.[11]  (Doc. 19.)  Defendant

7 Cardwood filed his supplemental briefing supporting the motion to

8 dismiss on September 10, 2007.  (Doc. 20.)  Plaintiff filed his

9 opposition to Defendants' motions on October 2, 2007. (Doc. 23,

10 24.)  Defendants' motions were granted, in part, on January 10,

11 2008, although John Garcia was permitted leave to amend.  (Doc.

12 34.)

13       Plaintiff filed his Fifth Amended Complaint ("5thAC") on

14 January 30, 2008.  (Doc. 35.)   The First Cause of Action alleges

15 assault against all Defendants; the Second Cause of Action alleges

16 battery against all Defendants; the Third Cause of Action alleges

17 false arrest and imprisonment with a warrant against all

18 Defendants; the Fourth Cause of Action alleges defamation by

19 slander against Cardwood;[12] the Fifth Cause of Action alleges a

20 violation of Title 42, United States Code, Section 1983 against all

21 Defendants.

22

23

24       [11] A stipulation and order was entered by the Court and parties
on August 31, 2007 setting the motion to dismiss hearing date on

25 Plaintiff's previous complaints and permitting supplemental
briefings to be filed to address any alleged remaining deficiencies

26 in the Fourth Amended Complaint; on the pending motions to dismiss.
(Doc. 18.)

27

28       [12]  Plaintiff's claim for defamation against Cardwood was
previously dismissed.  (Doc. 73, 2:6-2:9.)

1    Defendants Merced County, Sheriff's Dept., Taylor and Spencer
2    filed their answer on February 19, 2008.  (Doc. 36.)   Defendant
3    Cardwood filed his answer on February 26, 2008.   (Doc. 37.)

4        Defendant Cardwood filed this motion for summary judgment, or
5    in the alternative, summary adjudication on May 5, 2009.   (Doc.
6    58.) Defendant seeks judgment on the grounds that Plaintiff cannot
7    1) establish his federal constitutional claims, 2) overcome the
8    defense of qualified immunity.  Defendant also argues the state law
9    claims should be dismissed because the deputies 3) acted lawfully,
10   and 4) Plaintiff lacks evidence to create a genuine issue of
11   material fact.

12       Plaintiff filed his opposition to summary judgment or, in the
13   alternative, summary adjudication on July 1, 2009. (Doc. 73.)
14   Plaintiff opposes summary judgment on grounds that triable issues
15   of material fact exist as to his constitutional claims and state
16   law theories.   Plaintiff argues that Cardwood unlawfully searched
17   and seized him in violation of is Fourth Amendment rights, relying
18   on Agent Cardwood's and Deputy Taylor's alleged misrepresentations
19   and omissions to Judge Dougherty.  Plaintiff further contends that
20   neither the County of Merced nor the individual defendant deputies
21   are entitled to qualified immunity or any protections under the
22   California Government Code.

23

24                    IV. **LEGAL STANDARDS**.

25   A.   **Standard of Review**.

26       Summary judgment is appropriate when "the pleadings, the
27   discovery and disclosure materials on file, and any affidavits show
28   that there is no genuine issue as to any material fact and that the

                                13

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *see also S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (noting that a party moving for summary judgment on claim as to which it will have the burden at trial "must establish beyond controversy every essential element" of the claim) (internal quotation marks omitted).  With respect to an issue as to which the non-moving party will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984. When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'"  *Id.* (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  "Conclusory, speculative testimony in affidavits

**14**

1    and moving papers is insufficient to raise genuine issues of fact
2    and defeat summary judgment."  *Id.*

3         To defeat a motion for summary judgment, the non-moving party
4    must show there exists a *genuine* dispute (or issue) of *material*
5    fact.  A fact is "material" if it "might affect the outcome of the
6    suit under the governing law."  *Anderson*, 477 U.S. at 248.
7    "[S]ummary judgment will not lie if [a] dispute about a material
8    fact is 'genuine,' that is, if the evidence is such that a
9    reasonable jury could return a verdict for the nonmoving party."
10   *Id.* at 248.  In ruling on a motion for summary judgment, the
11   district court does not make credibility determinations; rather,
12   the "evidence of the non-movant is to be believed, and all
13   justifiable inferences are to be drawn in his favor."  *Id.* at 255.
14

15   B.   Section 1983.

16        Plaintiff brings this lawsuit under 42 U.S.C. § 1983, which
17   provides a cause of action "against any person acting under color
18   of law who deprives another 'of any rights, privileges, or
19   immunities secured by the Constitution and laws' of the United
20   States."  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887
21   (9th Cir. 2003)(quoting 42 U.S.C. § 1983).  "The rights guaranteed
22   by section 1983 are 'liberally and beneficently construed.'"  *Id*.
23   (quoting *Dennis v. Higgins*, 498 U.S. 439, 443 (1991).

24        To establish liability under 1983, a plaintiff must show 1)
25   that he has been deprived of a right secured by the United States
26   Constitution or a federal law, and 2) that the deprivation was
27   effected "under color of state law."  *Broam v. Bogan*, 320 F.3d
28   1023, 1028 (9th Cir. 2003).

**C.  Suits Against Government Officials: Official Capacity and Individual Capacity Suits.**

Suits against an official in her or his official capacity are treated as suits against the entity on whose behalf that official acts.  In such suits, the real party in interest becomes the entity for which the official works.  *Hafer v. Melo*, 502 U.S. 21, 25 (1991).  A federal action for monetary damages against an individual State official acting in his official capacity is barred by the Eleventh Amendment in the same way that an action against the State is barred.  *Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997).

In contrast, "[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions [taken] under color of state law."  *Dittman v. California*, 191 F.3d 1020, 1027 (9th Cir. 1999)(citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985))(internal quotations omitted).  To establish personal liability in a § 1983 action, it is enough to show that the official, "acting under color of state law, caused the deprivation of a federal right."  *Hafer*, 502 U.S. at 25 (internal quotations omitted).  Public officials sued in their personal capacity may assert personal liability defenses, such as qualified immunity. *Dittman,* 191 F.3d at 1027.  Here Plaintiff sues Agent Cardwood in his individual and official capacities.

**D.  Summary Judgment in the Qualified Immunity Context.**

In this case, Agent Cardwood asserts the defense of qualified immunity.  Qualified immunity is based on the policy concern that few individuals would enter public service if they risked personal

1  liability for their official decisions.  *Harlow v. Fitzgerald*, 457
2  U.S. 800, 814 (1982).  The immunity protects "all but the plainly
3  incompetent or those who knowingly violate the law," *Hunter v.*
4  *Bryant*, 502 U.S. 224, 228 (1991), and "spare[s] a defendant not
5  only unwarranted liability, but unwarranted demands customarily
6  imposed upon those defending a long drawn out lawsuit." *Siegert v.*
7  *Gilley*, 500 U.S. 226, 232 (1991).  Qualified immunity is not a
8  defense on the merits; it is an "entitlement not to stand trial or
9  face the burdens of litigation" that may be overcome only by a
10 showing that (1) a constitutional right was in fact violated and
11 (2) no reasonable deputy could believe defendant's actions were
12 lawful in the context of fact-specific, analogous precedents.
13 *Saucier v. Katz*, 533 U.S. 194, 200-202 (2001).

14

15                          **V.   DISCUSSION.**

16 **A.   Plaintiff's First and Second Causes of Action**

17      Plaintiff's First and Second Causes of Action allege that
18 Agent Cardwood committed assault and battery against Plaintiff on
19 December 6, 2006.  Cardwood seeks summary judgment as to these
20 causes of actions on grounds that there is no genuine issue of
21 material fact to show that County Defendants assaulted or battered
22 Plaintiff.   Plaintiff does not oppose Defendants' motion,
23 abandoning both causes of action.  (*See* Plaintiff's Opposition
24 ("Pl.'s Opp."), 2:3-2:12, filed July 1, 2009.)  Plaintiff states
25 that "Cardwood's motion has 'pierced' plaintiff's fifth amended
26 complaint; and that he has developed no evidence to support his
27 first and second causes of action for assault and battery." (*Id.*)
28      Plaintiff's Fifth Amended Complaint also contains allegations

                              17

concerning a "conspiracy" against Plaintiff by Agent Cardwood. These allegations are not separately enumerated as a cause of action.  Despite Agent Cardwood's motion for summary judgment as to the "conspiracy" claim, Plaintiff does not allege or discuss a conspiracy, nor does he provide any evidence to support Agent Cardwood's connection to the alleged conspiracy.  Based on the lack of evidentiary support and Plaintiff's concession that "he has no evidence of a conspiracy," there is no issue of material fact on as to Plaintiff's allegations of a conspiracy.[13]

Accordingly, summary judgment is GRANTED in favor of Agent Cardwood as to Plaintiff's first cause of action for assault and his second cause of action for battery.

Summary judgment is GRANTED in favor of Agent Cardwood as to the conspiracy allegations contained in Plaintiff's Fifth Amended Complaint.

B.    Fourth Amendment Claims (42 U.S.C. § 1983)

Plaintiff raises a number of arguments in support of his Fourth Amendment claims: (1) that Agent Cardwood violated his Fourth Amendment rights because he did not have probable cause to "plant the drugs" on Garcia; (2) Agent Cardwood misrepresented facts and omitted material information from the Oral Affidavit of Probable Cause, leading to an improper search of Plaintiff's office; and (3) there was no probable cause to detain Plaintiff

___

[13] In his opposition to County Defendants motion for summary judgment, Plaintiff abandons any allegations of a conspiracy, conceding that he "has no evidence of a conspiracy." (*Id*. at 2:8-2-9.)  For all intensive purposes, Plaintiff's opposition to the County's motion is identical his opposition to Cardwood's motion.

1  following the reverse sting operation.[14]

### 1.   Reverse Sting Operation

Plaintiff first alleges that Agent Cardwood violated his Fourth Amendment rights because he did not have probable cause to conduct a "reverse-sting" operation, transferring drugs to Plaintiff in the process.  Plaintiff frames the relevant issue as whether Cardwood had probable cause to plant the drugs on Garcia as a pretext to obtain a search warrant.

This argument partially fails because Plaintiff does not provide any authority for the proposition that the Fourth Amendment requires probable cause to conduct an undercover investigation or, in this instance, a reverse sting operation.   It is well-established that being a target of a law enforcement investigation – absent some allegation of a constitutional violation such as the fabrication of evidence – is not in and of itself actionable under § 1983.  *See United States v. Mayer*, 503 F.3d 740, 749-50 (9th Cir. 2007) (stating that "there is no requirement of probable cause when a law enforcement agency investigates an individual or group."); *see also Shields v. Twiss*, 389 F.3d 142, 150-51 (5th Cir. 2004) (dismissing allegations of "unreasonable investigation" because appellant "pointed to no legal basis for a § 1983 action of this sort, and the court knows of none.").

The Ninth Circuit recently reaffirmed this principle in

_____

[14] Although pled as a single cause of action, Plaintiff's Fifth Amended Complaint contains several non-enumerated claims for relief under the Fourth Amendment.   For purposes of this motion, each subsidiary theory for relief under the Fourth Amendment is treated as its own separate and distinct claim.

1    *Sanders v. City and County of San Francisco*, 226 F. App'x 687 (9th

2    Cir. 2007).  In *Sanders*, Plaintiffs, a former city police chief and

3    former deputy police chief, brought a § 1983 action against the

4    City, its former district attorney, and board of supervisors,

5    alleging that these defendants violated their constitutional rights

6    when they directed and participated in a criminal investigation

7    against the chiefs without probable cause.  The Ninth Circuit held

8    that there is no requirement to have probable cause before

9    commencing a criminal investigation:

10                 The district court properly dismissed appellants'
                   claim that Hallinan violated their constitutional
11                 rights when he directed and participated in a criminal
                   investigation into Sanders's and Robinson's police
12                 department activities, despite lacking probable cause
                   to do so. Appellants point to no case law that
13                 supports the proposition that probable cause must
                   exist before an investigation can commence. That is
14                 not surprising, given that the impetus behind criminal
                   investigations is to develop probable cause.
15

16   (*Id*. at 689.)

17         As *Macon* and *Sanders* demonstrate, Agent Cardwood did not

18   violate Plaintiff's constitutional rights when he coordinated a

19   sting   operation   which   transferred   methamphetamine   from   a

20   confidential informant to Plaintiff to test Plaintiff's willingness

21   to  knowingly  transport  narcotics  into  the  jail.   The  sting

22   operation was a pre-indictment investigation into possible criminal

23   behavior by the Plaintiff, which does not require a probable cause

24   determination.  *See id; Mayer*, 503 F.3d at 749-50*.  As the Ninth

25   Circuit stated in *United States v. Aguilar*, 883 F.2d 662, 705 (9th

26   Cir.  1989),  requiring  a  search  warrant  prerequisite  to  an

27   investigation "would  be  tantamount  to  prohibiting  a  criminal

28   investigation in its entirety, because the information learned from

undercover government agents is often the basis for probable cause."[15]  Under the facts of this case, it is difficult to see how such a criminal investigation violates any law, constitutional or otherwise.

It is equally well-established that the protections of the Fourth Amendment are implicated only if there has been a search or seizure under Fourth Amendment.  To the extent Plaintiff argues that he has a reasonable expectation of privacy in being free from a sting operation conducted by government agents and their informants on public property, his claim is foreclosed by Supreme Court and Ninth Circuit precedents.[16]

---

[15] Under slightly different facts in *United States v. Aguilar*, 883 F.2d 662, 705 (9th Cir. 1989), the Ninth Circuit discussed undercover operations in the context of probable cause: "A search warrant requirement for undercover government agents to investigate an organization concededly engaging in protected first amendment activities indeed would prohibit law enforcement officials from using an indispensable method of criminal investigation appropriate in any other circumstance ... [i]n many cases, a search warrant prerequisite would be tantamount to prohibiting a criminal investigation in its entirety, because the information learned from undercover government agents is often the basis for probable cause. The Constitution does not impose this high cost in the present case."

[16] During oral argument, following a discussion of the relevant case authorities on point, Plaintiff continued to "disagree that there was probable cause for the sting operation in the first place."  Plaintiff's arguments are misplaced.  It is well-established that not every investigatory technique is a search for Fourth Amendment purposes. *See Maryland v. Macon*, 472 U.S. 463, 470 (1985) ("The use of undercover officers is essential to the enforcement of vice laws ... [a]n undercover officer does not violate the Fourth Amendment merely by accepting an offer to do business that is freely made to the public."); *United States v. Mayer*, 503 F.3d 740, 750 (9th Cir. 2007) (stating that "undercover operations, in which the agent is a so-called 'invited informer,' are not 'searches' under the Fourth Amendment."); *United States v.

The relevant Fourth Amendment language provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The protections of the Fourth Amendment only apply if there has been a search or seizure, making the threshold inquiry in every Fourth Amendment analysis whether a search or seizure has occurred. A search is an intrusion on a person's "reasonable expectation of privacy" and requires Garcia to show both a subjective expectation of privacy and that the expectation is objectively reasonable. *United States v. Sandoval*, 200 F.3d 659 (9th Cir. 2000).

There is no evidence to suggest that Plaintiff had a subjective expectation of privacy in any aspect of the reverse sting operation or that his privacy expectation, if established, was objectively reasonable. Viewing all the evidence in his favor, as required on a motion for summary judgment, Plaintiff cannot establish a subjective expectation of privacy in the sting operation – or the courthouse where the sting operation took place – because Defendant Taylor never met with Task Force Agents in Plaintiff's office or on Plaintiff's property. No evidence suggests that the parties ever crossed paths or shared a jail meeting room. Plaintiff did not own the physical property used in

---

*Dovali-Avila*, 895 F.2d 206, 207-08 (5th Cir. 1990) (use of a well-trained and reliable narcotics dog on vehicles passing through a fixed border patrol checkpoint does not violate Fourth Amendment rights); *United States v. Hoffa*, 437 F.2d 11, 14 (6th Cir. 1971) (taping of a conversation between an information and a person being investigated does not violate Fourth Amendment rights when the consent of the informant is given.").

1   the sting; nor did he own the walkway adjacent to the courthouse.

2        On the issue of objective reasonableness, Garcia did not have

3   a possessory interest in the items used in the sting; Garcia could

4   not exclude others from the courtroom or the sidewalk adjacent to

5   the courthouse; Garcia took no precautions to maintain his privacy

6   outside the courthouse, as he accepted the Bulger tobacco package

7   from Pluckett on the courthouse steps, a public walkway.   This

8   evidence cuts against Plaintiff's claims of an unreasonable search

9   under the Fourth Amendment. *See, e.g., United States v. McCaster*,

10  193 F.3d 930, 933 (8th Cir. 1999); *LaDuke v. Nelson*, 762 F.2d 1318,

11  1326 n.11 (9th Cir. 1985).

12       Plaintiff's allegations do not provide a basis for a Fourth

13  Amendment privacy violation by coordinating the sting.[17]   To the

14  extent that Plaintiff argues that Defendant Taylor violated his

15  Fourth Amendment rights because he did not have probable cause to

16  conduct a "reverse-sting" operation, Plaintiff's claim is

17  foreclosed by well-established Ninth Circuit precedent.   It is

18  equally clear that Plaintiff does not have a "reasonable

19  expectation of privacy" in a pre-indictment sting operation

20  conducted by trained law enforcement officers on public property.

21

---

22       [17] Although somewhat unclear, it also appears Plaintiff raises
23  arguments similar to those contained in a line of cases holding
    "where it is the government that initiates the alleged criminal
24  activity and where the government either purchases or supplies the
    drugs, which party initiates the alleged crime is relevant and
25  important in assessing the degree of government involvement in
    setting up the crime." *See, e.g., Hampton v. United States*, 425
26  U.S. 484, 491 (1976).   Plaintiff's arguments in this regard are
27  unpersuasive, as the Hampton line of cases involved criminal
    appeals.

28

1   Plaintiff's attempt to expand the outer boundaries of Fourth

2   Amendment jurisprudence is unavailing. The sting did not

3   constitute a search under the Fourth Amendment. This law

4   enforcement conduct is not actionable.

5       Agent Cardwood's motion for summary adjudication on

6   Plaintiff's Fourth Amendment claim for lack of probable cause to

7   conduct a sting operation is GRANTED.

8

9       **2.   Oral Affidavit of Probable Cause**

10      The heart of Garcia's civil rights challenge is that Affiant

11  Cardwood caused Garcia's office to be improperly searched without

12  probable cause because Cardwood misrepresented facts and omitted

13  material information from the Oral Affidavit of Probable Cause.

14      A search made without probable cause violates the Fourth

15  Amendment right to be free from unreasonable searches and can be

16  the basis of a claim under 42 U.S.C. § 1983. An officer generally

17  has qualified immunity from a claim that he lacked probable cause,

18  absent a showing that a reasonably well-trained officer in his

19  position would have known that his warrant affidavit failed to

20  establish probable cause. *Malley v. Briggs*, 475 U.S. 335 (1986).

21  Where, as here, the officer is accused of deliberately

22  misrepresenting and omitting information from the affidavit making

23  it materially false and misleading, and the officer claims

24  qualified immunity, the Ninth Circuit has tailored this inquiry.

25  Specifically, in order to survive summary judgment, plaintiff must:

26  (1) make a substantial showing that Deputy Taylor's warrant

27  application contained a false statement or omission that was

28  deliberately false or made with reckless disregard for the truth;

**24**

1  and (2) establish that if the offending material is excised (and/or

2  the omission is included), the information provided to the

3  Magistrate would be insufficient to establish probable cause.

4  *Lombardi v. City of El Cajon*, 117 F.3d 1117, 1124-26 (9th Cir.

5  1997); *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995); *see also*

6  *Liston v. County of Riverside*, 120 F.3d 965, 972-73 (9th Cir.

7  1997).

8      Whether the statements were deliberately false is ultimately

9  a factual issue for the jury, but the plaintiff must at least make

10  a "substantial showing" on this issue to survive summary judgment.

11  *See Lombardi*, 117 F.3d at 1126, n.6; *Hervey*, 65 F.3d at 790-91.

12  Whether the alleged omissions are material is a question of law for

13  the Court to decide.  *Hervey*, 65 F.3d at 789.  If the plaintiff can

14  satisfy both of the above requirements, then the officer is not

15  entitled to qualified immunity and the claim proceeds to trial for

16  the jury to determine whether the officer deliberately or

17  recklessly included false statements (or omitted information) in

18  the affidavit. *Id*. at 791.

19

20          a. *Mr. Pluckett's Reliability*

21      In order for Agent Cardwood to be liable under the

22  misrepresentation/omission framework, Plaintiff must submit

23  admissible evidence supporting his allegation that Cardwood

24  deliberately or recklessly omitted information from his affidavit

25  for a search warrant.  Plaintiff alleges that Deputy Taylor misled

26  Judge Dougherty in his Oral Affidavit because he did not mention

27

28

25

Pluckett's criminal history.[18]   However, these allegations concern Deputy Taylor - not Agent Cardwood.   Although Agent Cardwood was present during Deputy Taylor's recitation of his investigation, Plaintiff does not provide any evidence that Taylor's omissions and/or misrepresentations were known to or should have been known to Agent Cardwood, to create liability under the Fourth Amendment. Plaintiff has not cited any case law supporting his theory of a peace officer's "duty to correct," as there is no foundational evidence that Cardwood had any knowledge about Plunkett or Deputy Taylor's alleged misrepresentations and omissions, which are Taylor's.[19]

Garcia relies heavily on a recent Ninth Circuit case, *United States v. Stadnisky*, 309 F. App'x 185 (9th Cir. 2009), to support his "omission" arguments, contending a minimum standard of required conduct (i.e., corroboration and disclosure) under the law enforcement misrepresentation and/or omission analysis.   Relying on *Stadnisky*, Plaintiff argues that "Taylor and Cardwood did not even take those most rudimentary steps ... they never investigated Plunkett's previous reliability and helpfulness as an informant." (Doc. 77, 12:11-12:14.)   However, Plaintiff's reliance on *Stadnisky*

---

[18]   Plaintiff also claims that nothing Plunkett said was against his penal interest.   This is not entirely accurate.   *See United States v. Terry-Crespo*, 356 F.3d 1170, 1176 (9th Cir. 2004) (observing that exposure to legal sanction for providing false information increases reliability of tip).

[19] Plaintiff asserts that Taylor did not inform Judge Dougherty about Pluckett's specific criminal history and bolstered Mr. Plunkett's credibility in the affidavit by covering his true motive for helping with the investigation - avoidance of a "third strike."

is misplaced for a number of reasons, most notably that the detectives in Stadnisky relied on information obtained from a confidential informant, not a known and disclosed informant such as Mr. Plunkett. *Stadnisky* does not support Plaintiff's litigation position. If anything, Stadnisky weakens it. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000) (stating that a known informant's tip is thought to be more reliable than an anonymous informant's tip because an anonymous informant typically cannot be questioned about the basis for knowing the information or motive for providing the tip, nor can the anonymous informant be held accountable for providing false information in violation of the law.).

Assuming, *arguendo,* that Plaunkett was facing a third strike and that Agent Cardwood knew about it, Plaintiff's strongest argument is that the issuing judge was prevented from evaluating Plunkett's credibility and motive to misrepresent based on the withholding of Plunkett's specific criminal history.

### b.  *Did Garcia Open the Bugler Flap?*

Plaintiff argues that the single most significant material misrepresentation to the judge in Agent Cardwood's oral affidavit is his misrepresentation that he observed Garcia open the Bugler pouch.[20]  Cardwood's Oral Affidavit stated that he observed Garcia

---

[20] Cardwood stated in the Affidavit: "I think it's important to clarify, and that in, when during the surveillance, I saw Mister Garcia take possession of, when Mister Plunkett handed it to him." ("Verbal Search Warrant," Doc. 58-7, Exh. A, pg. 15.)  There does not appear to any other mention of Garcia opening the Bugler pouch, other than Taylor stating: "Garcia took the package from him, which was a Bugler cigarette pack containing methamphetamine, which he had already looked at." (Id. at pg. 13.)  However, it is undisputed

1   open the flap, close it, and walk back to his office with the
2   tobacco pouch in his hand.   Plaintiff testifies that he never
3   opened the flap of the tobacco bag, but instead only accepted the
4   Bugler tobacco pouch from Plunkett and took it to his office.
5   Plaintiff also alleges that as Plunkett handed him the Bugler
6   pouch, he stated, "if there's anything else in here besides
7   tobacco, you take it back to Sylvia or wherever you got it."   It is
8   undisputed that Cardwood, who monitored the transaction via audio,
9   did not include this statement in his Oral Affidavit.   This is an
10  irreconcilable conflict in material facts bearing on Plaintiff's
11  alleged knowledge that the pouch contained methamphetamine.

12       Omitting, *arguendo*, the statement about Garcia opening the
13  flap and adding Plaintiff's statements concerning the package's
14  contents, does the affidavit still contain sufficient probable
15  cause for a search warrant against Garcia and his law office?   A
16  "totality of the circumstances test" applies to determine whether
17  a search warrant is supported by probable cause.   *Illinois v.*
18  *Gates*, 462 U.S. 213 (1983).   This test requires "a practical,
19  common-sense decision whether, given all the circumstances set
20  forth in the affidavit, including the 'veracity' and 'basis of
21  knowledge' of persons supplying hearsay information, there is a
22  fair probability that contraband or evidence of a crime will be
23  found in a particular place."   *United States v. Feeney*, 984 F.2d
24  1053, 1055 (9th Cir. 1993).

25       Here, the affidavit states that Deputy Taylor met with Mr.
26
27  _____
28  that Agent Cardwood maintains that he saw Garcia open the lid of
    the Bugler pouch.  (Doc. 58-8, Cardwood Dec. ¶ 7.)

Plunkett between three and ten times to investigate Plunkett's allegations concerning the jailhouse drug smuggling ring.  Taylor purportedly confirmed Plunkett's information (and his credibility) with outside sources.  He then contacted Special Agent Cardwood and organized the reverse sting and obtained fourteen ounces of methamphetamine from the Merced County Sheriff's Department. Deputy Taylor and Agent Cardwood placed the methamphetamine in a Bugler brand cigarette package, per the reported modus operandi. The methamphetamine was in plain view upon opening the Bugler package according to Taylor and Cardwood, which is categorically contradicted by Plaintiff.[21]  This fact can only be resolved by the trier of fact, not the court.

According to the affidavit, the "sting" operation required Plaintiff to contact John Garcia at the Merced County Superior Courthouse and give Garcia the Bugler tobacco pouch.  Plunkett was to tell Garcia that he was on a "pass" from Sandy Mush Correctional Facility and that the package was for Robledo.  After two unsuccessful attempts to give Garcia the Bugler pouch, Plunkett approached Garcia outside the courthouse.  The two walked to Garcia's office together, and Plunkett told Garcia he was on a

[21] Plaintiff avers that Cardwood misled the judge when he stated the methamphetamine was "outside the bag" and "outside the pouch."  (Doc. 73, 13:27-13:28.)  Plaintiff essentially argues Cardwood's misrepresentation created an inference that the methamphetamine was in "plain view," leading the issuing judge to find probable cause for knowing possession of methamphetamine. (Id. at 1:27-1:28.)  Drawing all inferences in Plaintiff's favor, coupled with the factual dispute about whether Plaintiff opened the Bugler pouch during his meeting with Plunkett, Cardwood's statement that the meth was "outside the bag," there is a material factual dispute as to Plaintiff's knowledge of a controlled substance.

29

1  "pass" from jail.   At this point, Plunkett produced the Bugler
2  tobacco pouch containing the methamphetamine and handed it to
3  Garcia.   Garcia took the Bugler tobacco pouch from Plunkett and
4  continued walking to his office.   Other Task Force members observed
5  the above events and confirmed that Plaintiff possessed the Bugler
6  package containing the methamphetamine when he entered his office
7  building.   However, there is a total conflict in the evidence
8  whether Plaintiff had knowledge of the presence of the controlled
9  substance, specifically whether the meth was in "plain view" and
10 whether Plaintiff opened the Bugler flap.

11     Although it is undisputed that the Bugler pouch contained
12 fourteen grams of methamphetamine, Plaintiff took possession of the
13 pouch, and continued on to his office, the dispute is whether
14 Plaintiff opened the tobacco package flap to show knowledge of the
15 presence of the controlled substance, which prevents the
16 establishment of an essential element of the crime existed to
17 believe that Plaintiff would knowingly accept a Bulger tobacco
18 package with meth for transport to Plaintiff's incarcerated client
19 at the jail, which Plaintiff took to his office.

20     The affidavit also includes communications between Officer
21 Cardwood and Garcia's secretary.   Cardwood called Garcia's
22 secretary following the pouch exchange and asked her if an unknown
23 man (Plunkett) followed Garcia into the office.   She replied in the
24 affirmative.   She also told Cardwood that when Garcia walked into
25 the office, he handed her the Bugler pouch and told her to "hold on
26 to this."   Cardwood then states that the secretary and Provencio
27 went into Garcia's office.   Garcia said "look at what we have
28 here," to which Provencio stated, "I'll take care of this."

Provencia then told the secretary it was methamphetamine and entered the bathroom.  The secretary then heard the toilet flush.

To determine if "what remains [is] sufficient to justify the issuance of the warrant," the missing information must be added to, and the misrepresentations subtracted from, Agent Cardwood's affidavit.  *Baldwin v. Placer County*, 418 F.3d 966, 970 (9th Cir. 2005); *Liston*, 120 F.3d at 973.  Here, the surviving assertions do not as a matter of law support a finding that there was probable cause to believe that Garcia knowingly transported the methamphetamine to his office or that some portion of it remained at the office at the time Taylor and Cardwood made their oral affidavits.  The judge, if Plaintiff's facts are true, did not have cause to believe that a search of Garcia's office would lead to the recovery of the methamphetamine and other incriminating evidence related to a scheme to knowingly transport meth to the jail for prisoners.[22]

### c.   *Miscellaneous Allegations*

Plaintiff also alleges that the warrant was "overbroad if their purpose was to recover the methamphetamine, this could have

---

[22] As to evidence concerning bad faith or a deliberate motive to fabricate evidence, Cardwood testified in his declaration that he had only a few brief encounters with Garcia prior to the sting operation and that he "never felt animosity towards" him. (Cardwood Dec. ¶ 19.)  Plunkett and Agent Carlisle also observed Garcia open the Bugler package, corroborating Cardwood's perceptions.  This according to Plaintiff is false which, if believed, is direct evidence of bad faith and dishonesty.  Based on the totality of the evidence, if believed, Plaintiff's facts could provide the inference Cardwood acted recklessly or in bad faith and that he intentionally and/or recklessly misrepresented these facts.

1    been accomplished by arresting Garcia outside his office."    The
2    Task Force's purpose was to investigate the smuggling of contraband
3    into the jail.    Although recovery of the methamphetamine was a
4    priority, it was not the primary or sole objective.    (Doc. 58-7,
5    Exh. A, pgs. 2-3, 16-17.)    "Law enforcement officers are under no
6    constitutional duty to call a halt to a criminal investigation the
7    moment they have the minimum evidence to establish probable cause."
8    *See United States v. Smith*, 802 F.2d 1119, 1124 (9th Cir. 1986)
9    (citing *United States v. Leon*, 460 F.2d 299, 300 (9th Cir. 1972));
10   *see also Hoffa v. United States*, 385 U.S. 293, 310 (1966) (stating
11   that "[t]here is no constitutional right to be arrested ... [t]he
12   police are not required to guess at their peril the precise moment
13   at which they have probable cause to arrest a suspect.").

14

15                    d.    *Conclusion*

16        For the reasons set forth above, Agent Cardwood's motion for
17   summary adjudication based upon qualified immunity is DENIED.    If
18   Agent Cardwood is found by the trier of fact to have made
19   misrepresentations and omissions, when taken together, present an
20   issue that they were material to the judge's determination of
21   probable cause and if the statements were truthful and the
22   omissions added, probable cause would not have existed.    Probable
23   cause to search rested on Plaintiff's knowledge that the Bugler bag
24   contained methamphetamine; the information allegedly falsified and
25   omitted by Agent Cardwood goes directly to the existence of this
26   requisite knowledge.

27        A reasonable jury could determine that Agent Cardwood acted
28   with at least recklessness in filling out the affidavit, given the

1    importance of Plaintiff's knowledge to a probable cause
2    determination and the number of misstatements and omissions. Agent
3    Cardwood is not entitled to qualified immunity on Plaintiff's
4    judicial deception claim.

5

6           3.    Stop of Plaintiff's Vehicle

7                 a.  *Did Probable Cause Exist?*

8           Plaintiff argues that there was no probable cause to stop and
9    detain him following the reverse sting operation. He criticizes
10   the tactics used but does not squarely address the issue of
11   probable cause for post-sting events. Agent Cardwood, invoking
12   qualified immunity, claims that probable cause was established by
13   Plaintiff's knowledge of the methamphetamine during the exchange
14   and that any inconsistencies in the affidavit "do not affect the
15   outcome of this case." The analysis above, however, shows that the
16   discrepancies were not minor, and that the record contains enough
17   evidence, if believed, to support a finding that Agent Cardwood
18   misrepresented these facts. Having already found that there was no
19   probable cause to search Plaintiff's law office for evidence of the
20   crime of knowing possession of a controlled substance, it follows
21   that genuine issues of material fact remain as to whether Cardwood
22   had probable cause to detain Plaintiff for that crime.

23          A peace officer is entitled to qualified immunity in a civil
24   rights action if the district court determines that, in light of
25   clearly established law governing the conduct in question at the
26   time of the challenged conduct, the officer could reasonably have
27   believed that the conduct was lawful. *Pearson v. Callahan*, ---
28   U.S. ---, 129 S.Ct. 808 (2009). The Supreme Court in *Saucier v.*

33

1    *Katz*, 533 U.S. 194 (2001), outlined a two-step approach to

2    qualified immunity.   The first step requires the court to ask

3    whether "[t]aken in the light most favorable to the party asserting

4    the injury, do the facts alleged show the officer's conduct

5    violated a constitutional right?" *Saucier*, 533 U.S. at 201;

6    *Millender v. County of Los Angeles*, 564 F.3d 1143, 1148 (9th Cir.

7    2009).   "If the answer to the first inquiry is yes, the second

8    inquiry is whether the right was clearly established: in other

9    words, 'whether it would be clear to a reasonable officer that his

10   conduct was unlawful in the situation he confronted.'" *Millender,*

11   564 F.3d 1143, 1148 (quoting *Saucier*, 533 U.S. at 201).    In

12   *Pearson*, the Supreme Court held that the court could exercise its

13   discretion in deciding which of the two prongs of the qualified

14   immunity analysis should be addressed first.   *Id*. at 818; *see also*

15   *Millender*, 564 F.3d at 1149.

16        The Fourth Amendment protects the right of the people to be

17   secure in their persons, houses, papers, and effects, against

18   unreasonable searches and seizures.   In conformity with the rule at

19   common law, a warrantless arrest by a law officer is reasonable

20   under the Fourth Amendment where there is probable cause to believe

21   that a criminal offense has been or is being committed." *Devenpeck*

22   *v. Alford*, 543 U.S. 146, 153 (2004) *(citing United States v.*

23   *Watson*, 423 U.S. 411, 417-24 (1976)).

24        "Probable cause exists when, under the totality of the

25   circumstances known to the arresting officers, a prudent person

26   would have concluded that there was a fair probability that [the

27   defendant] had committed a crime." *United States v. Buckner*, 179

28   F.3d 834, 837 (9th Cir. 1999) (quoting *United States v. Garza*, 980

F.2d 546, 550 (9th Cir. 1992)).  **Probable cause does not require overwhelmingly convincing evidence, but only "reasonably trustworthy information."** *Saucier v. Katz*, 533 U.S. 194, 207 (2001).

"**Probable cause is an objective standard and the officer's subjective intention in exercising his discretion is immaterial in judging whether his actions were reasonable for Fourth Amendment purposes.**" *John v. City of El Monte*, 505 F.3d 907, 911 (9th Cir. 2007) (citing *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007)).  "**It is essential to avoid hindsight analysis, i.e., to consider additional facts that became known only after the arrest was made.**" *Id.* (citing *Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989)).

**The oral affidavit of probable cause to search, while not definitive on the issue of probable cause to make a warrantless arrest,[23] provides a guide for determining the facts in Agent Cardwood's possession at the time of Garcia's stop.  The declaration of probable cause to search Garcia's office and person sets forth: Garcia was the subject of a criminal investigation into his alleged role in an operation involving smuggling contraband into Merced County Jail.   Task Force members claim to have**

---

[23] Although the parties frame their arguments in terms of an "arrest," there appears to be an argument that Plaintiff was merely detained while the agents obtained a search warrant. *See INS v. Delgado*, 466 U.S. 210, 216 (1984).  Agent Cardwood acknowledges this argument, but gives it short notice.  In his reply he states that "Plaintiff was never placed under arrest, only lawfully detained while a search warrant was sought and executed."  (Def.'s Reply, 3:11-3:14.) He then assumes there was a warrantless arrest and proceeds into his "probable cause" analysis.

1   confirmed Garcia's alleged role in the operation and organized a
2   reverse sting whereby a confidential informant would transfer to
3   Garcia a Bugler pouch containing fourteen grams of methamphetamine.
4   On the afternoon of February 6, 2006, Garcia took possession of the
5   tobacco pouch containing the methamphetamine and proceeded to his
6   office.   Garcia was in his office a few minutes, then left in his
7   black Volvo.   He was then stopped by an unmarked police vehicle,
8   searched, and placed in handcuffs.   If the basis to establish
9   Plaintiff's knowing possession was fabricated, all that follows is
10  fruit from of the poisonous tree.   *See, e.g., United States v.*
11  *Patane*, 542 U.S. 630, 637 (2004) (citing *Wong Sun v. United States*,
12  371 U.S. 471 (1963)).

13      Plaintiff does not dispute that he met with the Plunkett and
14  took the Bugler pouch – and the methamphetamine, ostensibly to
15  deliver to Robledo.   In essence, Plaintiff does not dispute he
16  possessed fourteen ounces of methamphetamine on the afternoon of
17  February 6, 2006 or that he left his office minutes later.
18  Plaintiff does dispute his "knowledge" of the contents of the
19  pouch, claiming was not aware the package contained
20  methamphetamine.   Plaintiff argues that this forecloses any finding
21  of probable cause to support a warrantless arrest.

22      Knowing or intentional possession of methamphetamine is a
23  public offense within the meaning of the statute.   See Cal. Pen.
24  Code, § 15(2), (3) (defining "public offense" as violation of the
25  law for which a person may be, inter alia, imprisoned or fined);
26  Cal. Health & Safety Code, §§ 11377, 11378; 21 U.S.C. § 844(a).
27  Although Agent Cardwood was not required to be completely accurate
28  in his belief that Plaintiff knowingly possessed the

methamphetamine in order to make a warrantless arrest, he was required to have known whether the meth was immediately visible in the pouch to support a believed that Plaintiff knowingly possessed the methamphetamine in order to make a warrantless arrest.

Here, Plaintiff claims that he did not open the Bugler package until he arrived at his office and therefore did not knowingly possess methamphetamine. (Garcia Dep. 88:14-17; 89:9-14.) The record demonstrates that Cardwood's belief is completely inconsistent with Plaintiff's description of what was visible when Plaintiff accepted the Bugler package from Plunkett. Specifically, Plaintiff maintains that he did not open the flap of the Bugler pouch and the methamphetamine was not in "plain view," negating any purported knowledge of a controlled substance. Regardless of whether Plaintiff actually did open the package, the Agents could not entertain an honest and strong suspicion that Plaintiff had knowledge of the contents of the Bugler package, which would have revealed the methamphetamine, if it was not visible as Plaintiff has testified. Probable cause is not established.

The focus is on all the facts in Agent Cardwood's possession and whether, in light of these facts, there was probable cause to arrest Garcia, or whether a reasonable officer could have believed there was probable cause to arrest. This remains in material dispute.

Viewing the evidence in the light most favorable to Plaintiff, he has shown that if the trier of fact believes Plaintiff had no knowledge, he was arrested or detained without probable cause in violation of the Fourth Amendment. The qualified immunity analysis ends there. *See Saucier*, 533 U.S. at 201. There is a genuine

1  issue of material fact. Defendants' motion for summary

2  adjudication on this claim is DENIED.

3      Although the parties frame their arguments in terms of

4  "probable cause" for arrest, an alternate analysis exists under

5  *Terry v. Ohio*, 392 U.S. 1 (1968). A "Terry" stop or investigative

6  detention requires only reasonable suspicion that the detainee is

7  engaged in criminal activity. *Berkemer v. McCarty*, 468 U.S. 420,

8  439 (1984). "To detain a suspect, a police officer must have

9  reasonable suspicion, or 'specific, articulable facts which,

10 together with objective and reasonable inferences, form the basis

11 for suspecting that the particular person detained is engaged in

12 criminal activity.'" *United States v. Michael R.*, 90 F.3d 340, 346

13 (9th Cir. 1996) (quoting *United States v. Garcia-Camacho*, 53 F.3d

14 244, 245 (9th Cir. 1995)). To determine whether reasonable

15 suspicion existed, the court must consider the totality of the

16 circumstances surrounding the stop. *Id.* (citing *United States v.*

17 *Hall*, 974 F.2d 1201, 1204 (9th Cir. 1992)).

18     This involves no different result based on the dispute over

19 the truthfulness of the law enforcement witnesses version of

20 events. Task Force Agents observed Garcia take the methamphetamine

21 to his law office. A few minutes later, he exited his office,

22 entered his vehicle, and drove away. At that time, whether the

23 agents had a reasonable suspicion that Garcia was engaged in

24 criminal activity, i.e., to transport the meth to the jail for

25 Robledo, depends on Plaintiff's knowledge of the presence of the

26 meth, which is totally in dispute. These observations do not

27 create a reasonable suspicion that Plaintiff may have been involved

28 in criminal activity if the agents were truthful. If the affidavit

1  was false, Plaintiff's detention pending further investigation
2  pursuant to the search warrant was unnecessary. Summary
3  adjudication on this ground is DENIED.

4

5              b.  *Unreasonable Detention*

6      Although not addressed in his opposition papers, Plaintiff
7  appeared to raise the issue of unreasonable detention during oral
8  argument on July 27, 2009.

9      First, although not disputed by Plaintiff, the length of
10 Plaintiff's detention was unreasonable if there was no cause for
11 his detention.  In *Muehler v. Mena*, 544 U.S. 93 (2005), police
12 detained Mena for two to three hours in handcuffs while executing
13 a search warrant.  *Id*. at 1469.  Here, Plaintiff was detained for
14 approximately three hours while agents waited for a special master.
15 Plaintiff was released ninety minutes after the special master
16 arrived.  Nevertheless, the length of Plaintiff's detention was
17 unlawful if Plaintiff's facts are believed.

18     The level of force used by the agents is not disputed, except
19 if there was no cause for the detention.  Although Plaintiff was
20 handcuffed during the search of his office, he was never physically
21 touched by officers, other than to place him in handcuffs or to
22 remove his handcuffs to let him use the bathroom.  In his December
23 30, 2008 deposition, Plaintiff conceded that the officers acted
24 reasonably when they detained him:

25         Q.   Do you have any facts to show that the defendants
                used unreasonable force?
26
        A.   No.  They didn't manhandle me, they didn't throw
27             me to the ground.  I wasn't physically harmed in
               any way.
28

(Garcia Dep. 195:3-195:7.)

In support of its argument, the County of Merced submitted the deposition of an expert on police procedures, Mr. Miller, who has been a full-time peace officer since 1981.[24]  Mr. Miller testified in his deposition that in his opinion the agents acted reasonably in detaining Garcia and excessive force was not used; that the period of time was not unreasonable because the special master did not arrive until 1940 hours; Deputy Taylor moved the investigation along by taking statements from those named in the warrant; and the search took only 95 minutes once the special master arrived.[25] (Doc. 67-8, ¶ 13.)  Mr. Miller also opined that the officers did not use excessive force as Garcia was purportedly involved in a narcotics smuggling ring.  (Id.)  Miller emphasized that drug offenses are "frequently associated with weapons."  (Id.)

Based on the overall dispute in the evidence, summary adjudication is DENIED on Plaintiff's unreasonable detention claim, because the detention was unlawful if the seizure was tainted by a prior illegal search warrant and search.

---

[24] Mr. Martin's deposition is offered in support of County Defendants' motion for summary judgment.  (Doc. 67-8.)  However, Martin's declaration, specifically opinions number four, five, and six, addressed the "steps taken by the agents in detaining Mr. Garcia."  (Id. at ¶¶ 12-14.)

[25] Portions of Miller's declaration contain inappropriate legal conclusions.  These opinions are inadmissible and not considered. See United States v. Scholl, 166 F.3d 964, 973 (9th Cir. 1999) (excluding expert testimony offering a legal conclusion); Aguilar v. International Longshoremen's Union, 966 F.2d 443, 447 (9th Cir. 1992) (noting matters of law are for the court's determination, not that of an expert witness).

### c.  *Conclusion Re: Stop of Plaintiff's Vehicle*

After viewing the entirety of the evidence in Plaintiff's favor, drawing all inferences in his favor, Defendant is not entitled to qualified immunity.  There remains disputed material facts concerning Agent Cardwood's alleged wrongful conduct under the Fourth Amendment.

Summary adjudication is DENIED as to Agent Cardwood's motion on Plaintiff's fifth cause of action.

### C.  State Law Claim - False Arrest/Imprisonment

Agent Cardwood argues that summary adjudication is warranted on the false arrest/imprisonment claim for the same reasons that it was warranted for Plaintiff's claim under § 1983, i.e, because probable cause existed for the search warrant and the arrest.

The tort of false imprisonment is: "(1) the nonconsenual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." Easton v. Sutter Coast Hosp., 80 Cal. App. 4th 485, 496 (2000). "Under California law, the torts of false arrest and false imprisonment are not separate torts, as false arrest is 'but one way of committing a false imprisonment.'" *Watts v. County of Sacramento*, 256 F.3d 886, 891 (9th Cir. 2001) (quoting *Asgari v. City of Los Angeles*, 15 Cal.4th 744 (1997)). "A cause of action for false imprisonment based on unlawful arrest will lie where there was an arrest without process followed by imprisonment." *Watts*, 256 F.3d at 891 (citing *City of Newport Beach v. Sasse*, 9 Cal. App. 3d 803 (1970)).

In this case, Plaintiff alleges that he was falsely arrested

41

1   during the vehicle stop prior to the search of his office and that
2   he was falsely imprisoned based on Agent Cardwood's
3   misrepresentations and omissions in his Oral Affidavit for a Search
4   Warrant.  Because there is a total dispute as to probable cause for
5   arrest and detention of Plaintiff based on the Task Force Agents'
6   observations that Plaintiff possessed the methamphetamine and
7   returned with it to his office, summary adjudication must be denied
8   on this claim.

9       It is disputed whether probable cause existed for Agent
10  Cardwood's stop of Plaintiff and for the search of his law office.
11  Summary judgment is DENIED as to Plaintiff's state law claims for
12  false imprisonment/arrest.

13

14                  IV. <u>CONCLUSION</u>.

15      For the reasons discussed above:

16      1.  The motion for summary adjudication on the first cause of
17  action for assault and the second cause of action for battery is
18  GRANTED.  Plaintiff concedes in his opposition that he has
19  developed no evidence to support his first and second causes of
20  action for assault and battery.

21      2.  The motion for summary adjudication on the conspiracy
22  allegations contained in Plaintiff's Fifth Amended Complaint is
23  GRANTED.  In his opposition, Plaintiff abandons any allegations of
24  a conspiracy against Agent Cardwood.

25      3.  The motion for summary adjudication on Plaintiff's
26  allegations that Agent Cardwood violated his Fourth Amendment
27  rights by conducting a reverse sting operation on February 6, 2006
28  is GRANTED.

**4.** The motion for summary adjudication on the Fourth Amendment claim for judicial deception (*Franks* claim) is DENIED.

**5.** The motion for summary adjudication on the Fourth Amendment claim for unreasonable arrest and detention under the Fourth Amendment is DENIED.

**6.** The motion for summary adjudication on the related state law claim for false arrest/imprisonment is DENIED.

Consistent with Rule 56(d)(1), both parties shall have five (5) days following service of this decision to file a list of material facts which each party believes are not genuinely at issue for purposes of trial. If separately filed by the parties, these lists shall not exceed five pages.  To the extent practicable, the parties should meet and confer to determine whether and to what extent any material facts are agreed upon for purposes of trial. Agreed upon facts should be listed in a joint filing. Any such joint filing has no page limitation.

Plaintiff shall submit a form of order consistent with, and within five (5) days following electronic service of, this memorandum decision.

IT IS SO ORDERED.

Dated: ___September 25, 2009___          ___/s/ Oliver W. Wanger___
                                          **UNITED STATES DISTRICT JUDGE**

43