1
2
3                 UNITED STATES DISTRICT COURT
4                 EASTERN DISTRICT OF CALIFORNIA
5
6
7  JOHN GARCIA,                    No. 1:07-CV-00867-OWW-DLB
8           Plaintiff,            MEMORANDUM DECISION RE COUNTY
     v.                            DEFENDANTS' MOTION FOR
                                   SUMMARY JUDGMENT OR PARTIAL
9  CITY OF MERCED, CITY OF MERCED  ADJUDICATION (Doc. 64)
   POLICE DEPARTMENT, BUREAU OF
10  NARCOTICS ENFORCEMENT SPECIAL
   AGENT SUPERVISOR ALFREDO
11  CARDWOOD, et al.,
12           Defendant.
13
14                 I.    Introduction.
15       Plaintiff John Garcia, an attorney, initiated this action on
16  March 13, 2007, and, on January 30, 2008, filed the operative fifth
   amended complaint ("5thAC") alleging a violation of his Fourth
17  Amendment rights and several state law causes of action.  His suit
18  arises from, but is not limited to, a warrant that was executed on
19  February 6, 2006 for the search of his law office in Merced,
20  California.  The warrant was a culmination of the Merced Multi-
   Agency Narcotic Task Force's investigation into allegations that
21  Garcia was smuggling narcotics into the Merced County Jail.  Based
22  on information from Robert Plunkett, an incarcerated informant, the
23  Task Force conducted a "reverse sting" operation where Task Force
24  Agents observed Plaintiff receive, inspect, and transport
25  approximately fourteen grams of methamphetamine offered to him by
26  Mr. Plunkett.  Following the sting, Task Force Agents obtained a
27  warrant to search 655 West Nineteenth Street, Merced, California,
28

1   the law offices of John Garcia.   The warrant was based on the oral
2   affidavit of Deputy Sheriff John Taylor and was approved by Judge
3   Frank Dougherty of the Merced Superior Court.

4       On January 30, 2008, Plaintiff filed his Fifth Amended
5   Complaint against Defendants City of Merced; City of Merced Police
6   Department;[1] Bureau of Narcotics Enforcement Special Agent Alfredo
7   Cardwood ("Cardwood"); County of Merced; Merced County Sheriff's
8   Department; Merced County Deputy Sheriff John Taylor ("Taylor");
9   Merced County District Attorney's Office; and Merced County
10  District Attorney Gordon Spencer ("Spencer").   The First Cause of
11  Action alleges assault against all Defendants; the Second Cause of
12  Action alleges battery against all Defendants; the Third Cause of
13  Action alleges false arrest and imprisonment with a warrant against
14  all Defendants; the Fourth Cause of Action alleges defamation by
15  slander against Cardwood; the Fifth Cause of Action alleges a
16  violation of Title 42, United States Code, Section 1983 against all
17  Defendants.[2]

18      Before the court for decision is a motion for summary judgment
19  or, in the alternative, summary adjudication filed by Defendants
20  County of Merced, Merced County Sheriff's Department, Merced County
21  Deputy Sheriff John Taylor, Merced County District Attorney's
22  Office, and Merced County District Attorney Gordon Spencer.

23  _____

24      [1] City of Merced and City of Merced Police Department were
25  dismissed pursuant to stipulation (F.R.C.P. 41(a)) on June 17,
    2009.  (Doc. 70.)

26      [2] The motion for summary judgment filed by Defendant Alfredo
27  Cardwood, Special Agent, California Department of Justice, Bureau
    of Narcotic Enforcement is resolved by separate Memorandum
28  Decision.

1          **II.     Factual Background.**[3]

2   **A.     The Parties**

3          Plaintiff is an individual and experienced criminal defense

4   attorney.   For the past twenty years, Plaintiff represented

5   criminal defendants in Merced County, including Alfonso Robledo, an

6   inmate at Merced County Jail in early 2006.

7          Defendant Alfredo Cardwood is a special agent with the State

8   of California Department of Justice, Bureau of Narcotics

9   Enforcement ("BNE").   The BNE has nine regional offices and

10  numerous regional task forces located throughout California,

11  including the Merced Multi-Agency Narcotic Task Force.   Special

12  Agent Cardwood was the supervising agent in charge of the Merced

13  Multi-Agency Narcotic Task Force.

14         Defendant County of Merced is a municipal entity organized

15  under California law.   Merced County Sheriff's Department is a

16  political subdivision of the County of Merced, with the

17  responsibility to maintain and administer law enforcement in Merced

18  County.[4]  Defendant John Taylor is a deputy with the Merced County

19  _____

20         [3] Unless otherwise noted, the facts are undisputed.  [(See
21  Def.'s Stmt. of Undisp. Facts in Supp. of Summ. J. ("SUF"), Doc.
    66, filed May 5, 2009).] Plaintiff filed objections to certain
22  items of Defendant's evidence. Except where otherwise noted, such
    evidence is immaterial to the court's analysis of Defendant's
23  motion or the objections are without merit.

24         [4] "Merced County Sheriff's Department" is not a legal entity.
25  *Maxwell v. Henry*, 815 F. Supp. 213, 215 (S.D. Tex. 1993).   Nor is
    the Merced County Sheriff's Department a "person" for purposes of
26  § 1983 litigation.  *Vance v. County of Santa Clara*, 928 F. Supp.
    993 (N.D. Cal. 1996).   Plaintiff has also sued "Merced County"
27  which is the proper legal entity to be sued in this type of case.
    Therefore, summary adjudication is GRANTED in favor of the Merced
28  County Sheriff's Department.

3

1   Sheriff's Department, acting as the Task Force's primary case
2   agent.

3   Defendant Merced County District Attorney's Office was
4   established by the Constitution of the State of California,
5   Government Code Section 26500, to provide prosecution and
6   enforcement services in adult and juvenile criminal matters in
7   Merced County.[5]  At all relevant times herein, Gordon Spencer was
8   the District Attorney for Merced County.

9   In January 2006, Doug Jensen, Commander of the Merced County
10  Sheriff's Department, notified Deputy Taylor that Robert Plunkett
11  ("Plunkett"), an inmate at Sandy Mush jail in Merced County, told
12  one of his Sergeants, Sergeant Pace, that a local attorney was
13  smuggling contraband into the jail. (SUF 5.)  Plunkett told
14  Sergeant Pace that an attorney named "John Garcia" smuggled
15  contraband into the jail using "Bugler" tobacco packaging as a
16  cover.[6]  (SUF 6.)  Sergeant Pace communicated these statements to
17  Commander Jensen, who relayed them to Deputy Taylor.

18  Thereafter, Taylor interviewed the confidential informant, Mr.
19  Plunkett, regarding the alleged smuggling.   Plunkett informed
20

21      [5] Merced County District Attorney's Office is not a proper
22  party defendant.  Summary adjudication is GRANTED in favor of the
    Merced County District Attorney's Office.
23

24      [6] In his sworn deposition taken on September 22, 2008,
    Plaintiff conceded that, prior to December 6, 2006, he delivered
25  tobacco three times to Mr. Robledo at the Merced County Jail.
    (Doc. 67-4, 91:17-93:12.)  Plaintiff admitted that he knew it was
26  against jail rules, that he delivered it in the interview room, and
    the "delivery" was orchestrated through Ms. Sylvia Brown.  (Id.)
27  Plaintiff also admitted that he had previously delivered tobacco to
    inmates approximately ten times "over the twenty years I've
28  practiced."  (Id.)

**4**

1  Taylor that Robledo, a fellow inmate, told him that he obtained
2  drugs through his attorney, John Garcia.   According to Plunkett
3  (via Robledo), Garcia would bring the drugs to their attorney-
4  client meetings, disguised in a Bugler cigarette package.   Garcia
5  would give the Bugler package containing the contraband to Robledo,
6  who would return to his cell with the Bugler package.

7      Taylor met with Plunkett between three and ten additional
8  times over the next twenty days.   Plunkett provided further details
9  of   the   alleged   smuggling,   including   that   certain   nonviolent
10 offenders smuggled contraband into the Jail while on a "pass" from
11 the facility.   (SUF 14.)   These individuals would obtain the
12 contraband and either place it in one of their body cavities or
13 hand it off to Garcia, who would bring it into the Jail at a later
14 date.   (SUF 14.)   Plunkett also told Taylor that the alleged
15 members of the smuggling ring included Robledo, Garcia, Sylvia
16 Brown, a friend of Robledo's, and two private investigators working
17 for Garcia, Augustine Provencio and Greg Hassen.   Plunkett provided
18 only layer hearsay from third parties, not based on Plunkett's
19 personal knowledge.

20     Deputy   Taylor   then   purportedly   corroborated   Plunkett's
21 statements about the smuggling ring, including the identities of
22 the alleged participants and the basis for Plunkett's knowledge by
23 researching jail records to confirm that inmate Robledo was in
24 custody at the Merced County Jail on various drug-related offenses
25 and that Robledo and Plunkett shared a housing unit.   (SUF 18-19.)
26 Deputy   Taylor   also   checked   John   Garcia's   criminal   record,
27 confirming that Garcia had a history of drug-related violations.
28 (SUF 20.)

1    Deputy Taylor also checked Plunkett's name in a computer
2  database of unreliable informants, maintained by narcotics officers
3  who were given unreliable tips.   Plunkett's name was not in the
4  database.    Deputy Taylor also discovered Sylvia Brown's phone
5  number in one of Robledo's previous bookings.  According to Taylor,
6  Plunkett's information was "credible."  Agent Cardwood was familiar
7  with the steps Deputy Taylor took to build the case.    (Cardwood
8  Dec. ¶ 4.)

9    The Task Force then planned a reverse-sting operation to
10 confirm Plunkett's statements and determine whether or not Garcia
11 was smuggling contraband into the Jail.   In early February 2006,
12 Agent Taylor obtained methamphetamine from the Merced County
13 evidence department for the reverse-sting operation.    After the
14 Court granted the order to obtain the methamphetamine, it was
15 placed in a Bugler brand cigarette package.   According to Taylor
16 and Cardwood, the methamphetamine was clearly visible upon opening
17 the Bugler package.

18    On February 6, 2006, Agent Taylor and another Task Force Agent
19 met with Plunkett, searched his person for illegal contraband or
20 narcotics, and upon finding none, the officers gave Plunkett the
21 methamphetamine.    Plunkett was fitted with both a "wire" and a
22 digital recorder.    The sting operation required Plaintiff to
23 contact John Garcia at the Merced County Superior Courthouse,
24 giving him the Bugler tobacco pouch.   Plunkett would tell Garcia
25 that he was on a pass from Sandy Mush Correctional Facility and
26 that the package was for Robledo.    Agent Cardwood personally
27
28

6

monitored the wire during the reverse-sting operation.[7]   In addition to audio surveillance, Agent Cardwood was stationed in a vehicle near Plaintiff's office and had a clear view to monitor the interaction between Plaintiff and Plunkett. (Cardwood Dec. ¶ 6.)

Plunkett proceeded to the Merced County Superior Court and approached John Garcia in one of the courtrooms.  Plunkett told him that he was a friend of one of Garcia's clients, Alfredo Robledo. Plaintiff gave Plunkett a business card and told him to contact his office.  Plunkett then left the courtroom.

Approximately one hour later, Plunkett approached Garcia outside the courtroom and told him he had a package for Garcia. Plaintiff instructed Pluckett to drop it off at his office and returned to the courtroom.  A short time later, Pluckett approached Garcia outside the courthouse, telling him that he could not locate his office.  As they walked toward Garcia's office, Plunkett told Garcia that he was on an afternoon pass from Sandy Mush and celled with Robledo.   Plunkett then produced the Bugler tobacco pouch containing the methamphetamine and handed it to Garcia.   Garcia took the Bugler tobacco pouch from Pluckett and continued walking to his office.  Plaintiff possessed the Bugler package containing the methamphetamine when he entered his office building.

The record reflects considerable dispute over whether Garcia opened the Bugler package while he and Pluckett were walking to Garcia's office.  Agent Cardwood maintains that Plaintiff opened the Bugler package, looked inside, closed the package, and walked

---

[7] According to Cardwood, the transmission was of poor-quality, making it difficult to hear the parties. (Cardwood Dec. ¶ 6.)

1  to his office.   (Cardwood Dec. ¶ 7.)   Cardwood maintains that the
2  methamphetamine was directly underneath the flap, clearly visible
3  to anyone who opened it.   (Cardwood Dec. ¶ 5.)   Agent Carlisle and
4  Plunkett also observed Garcia look inside the tobacco pouch during
5  the exchange. (Taylor Dec. ¶ 22.)

6      According to Plaintiff, he told Pluckett that, "if there's
7  anything in here besides tobacco, you take it back to Sylvia or
8  wherever you got it."   Plaintiff testified that he did not open the
9  tobacco pouch during the exchange nor did he open it during the
10  walk to his office.

11      At his office, Garcia and one of his investigators, Provencio,
12  opened the tobacco pouch and discovered the methamphetamine.
13  Garcia then instructed Provencio to flush the methamphetamine down
14  the toilet.   Provencio did so and then discarded the bag into the
15  bathroom trash can.   Garcia then left his office in a black Volvo.

16      After driving one mile, Garcia's Volvo was stopped by a
17  unmarked City of Merced police vehicle.   Agent Cardwood approached
18  Garcia's stopped vehicle, directing him to exit the vehicle and
19  proceed to the sidewalk.   Plaintiff was then handcuffed and
20  searched.   Plaintiff was then told he would be transported back to
21  his office for questioning.   Plaintiff's office was "frozen"
22  pending the issuance of a search warrant, ensuring that no one
23  entered or exited the building.

24      Garcia was not threatened during the vehicle stop and there
25  was no physical contact other than the brief search.   At no time
26  did the Task Force Agents tell Plaintiff he was under arrest.   The
27  entire stop took less than half an hour.

28      While Plaintiff was transported back to his office, Agent

1  Cardwood and Taylor sought a search warrant from Superior Court

2  Judge Frank Dougherty.   In a verbal search warrant application,

3  under penalty of perjury, Cardwood and Agent Taylor testified to

4  the investigation and their observations during the reverse-sting

5  operation.    Judge Dougherty found probable cause to issue the

6  search warrant based on the fact that Plaintiff had taken

7  possession of the methamphetamine.   The search warrant authorized

8  a search of Plaintiff, Plaintiff's vehicle and Plaintiff's office

9  to allow, in part, the recovery of the methamphetamine. Judge

10 Dougherty appointed a Special Master, Gerald Brunn, to be present

11 during the search.[8]

12     Plaintiff's allegations focus on Agent Cardwood's and Deputy

13 Taylor's alleged misrepresentations and omissions to Judge

14 Dougherty supporting Deputy Taylor's Oral Affidavit.   According to

15 Plaintiff, Agent Cardwood's observation that Garcia opened the

16 bugler pouch is a total fabrication.    Plaintiff maintains that

17 while he accepted the Bugler pouch from Plunkett, he did not open

18 the flap nor did he see the methamphetamine.    Plaintiff also

19 accuses Deputy Taylor of misrepresenting and omitting material

20 facts, specifically, omitting Mr. Plunkett's criminal history and

21 incentive to avoid a third strike as bearing on his credibility.

22 Agent Cardwood and Deputy Taylor maintain that all of the

23 information they provided to Judge Dougherty on February 6, 2006

24 was accurate and true.   (Taylor Dec. ¶ 24; Cardwood Dec. ¶ 14.)

25     The search of Garcia's office revealed a plastic baggie

26

27     [8] The search did not commence until Specal Master Brunn

28 arrived.   Defendants provided Garcia's staff with dinner while
   waiting for Special Master Brunn to arrive.

containing a small amount of methamphetamine in the bathroom area and a small amount of methamphetamine residue in the main office. Six packages of "Bugler" brand tobacco and one ziplock bag of tobacco were found in the top drawer of Garcia's office. A one pound scale, similar to the kind used to weigh drugs, was found on Garcia's desk.[9]

Following the search, Agent Cardwood and Deputy Taylor removed Garcia's handcuffs and advised him of his Miranda rights. Cardwood and Taylor interviewed Garcia for approximately one hour.[10] Garcia was then released. Garcia was not arrestd, charged, or prosecuted in connection with the criminal investigation.

### III.   Procedural History.

On March 13, 2007, Plaintiff filed a complaint in the Superior Court, County of Merced, against the County of Merced, Merced County Sheriff's Department, Deputy Taylor, District Attorney Gordon Spencer, Special Agent Cardwood, City of Merced, and Merced Police Department.[11] Plaintiff alleged defendants were liable under state law theories of assault, abuse of process, and defamation by slander.

Plaintiff filed his first amended complaint on March 21, 2007,

---

[9] Plaintiff was detained in his office during the search, but was not arrested. According to Defendants, Plaintiff was permitted to use the restroom and was not threatened or mistreated during his detention.

[10] Plunkett consented to wearing a wire and recording his conversation with Plaintiff.

[11] Defendants City of Merced and City of Merced Police Department were dismissed on June 17, 2009. (Doc. 70.)

his second amended complaint on April 5, 2007, and his third amended complaint on May 23, 2007.  Unlike his previous complaints, Garcia's third amended complaint included a cause of action for violation of federal civil rights pursuant to 42 U.S.C. 1983.  On June 15, 2007, the case was removed to federal court.[12]  (Doc 1.)

On August 20, 2007, Plaintiff filed a Fourth Amended Complaint against Defendants.  Plaintiff alleged defendants were liable under 42 U.S.C. 1983 for unreasonable search and seizure (Count V); under the California Constitution for unlawful search and seizure (Count VI); and state law claims for assault and battery, false arrest and imprisonment, abuse of process, and defamation by slander (Counts I-IV).  The deputies are sued in their individual capacities and the County of Merced is sued as a municipal entity that acts by and

---

[12]    Plaintiff filed his original complaint in the Superior Court of Merced on March 13, 2007. Plaintiff then amended his complaint and filed his First Amended Complaint on March 21, 2007 to substitute real names for fictitious "Doe" defendants. Plaintiff filed yet another amended complaint, his Second Amended Complaint on April 5, 2007, pursuant to an *ex parte* application before Defendants Merced and Merced Police could file a demurrer on the first amended complaint, which they claim they were preparing. Defendants Merced, Merced Police and Merced County timely filed demurrers against the Second Amended Complaint, and a hearing was set for May 31, 2007.  Plaintiff filed yet another amended complaint, a Third Amended Complaint on May 23, 2007. The Superior Court of Merced permitted the demurrer to the Second Amended Complaint go forward despite the filing of the Third Amended Complaint. At the hearing the Court stated that it would allow the Third Amended Complaint but would allow no further amendments until Defendants have had the opportunity to test the sufficiency of the new complaint's allegations. The Third Amended Complaint contained a federal cause of action pursuant to 42 U.S.C § 1983 and, Defendants removed the action to Federal Court.  Defendants then timely filed a motion to dismiss the Third Amended Complaint on June 19, 2007. Plaintiff filed his Fourth Amended Complaint on August 20, 2007. Defendants Merced and Merced Police then sought relief from the Court by their filing on August 28, 2007.

through its individual deputies.   (Doc. 15.)

Defendants Merced County, Sheriff's Dept., Taylor and Spencer filed their supplemental brief on the motion to dismiss the Fourth Amended Complaint on September 4, 2007.[13]   (Doc. 19.)   Defendant Cardwood filed his supplemental briefing supporting the motion to dismiss on September 10, 2007.   (Doc. 20.)   Plaintiff filed his opposition to Defendants' motions on October 2, 2007. (Doc. 23, 24.)   Defendants' motions were granted, in part, on January 10, 2008, although John Garcia was permitted leave to amend.   (Doc. 34.)

Plaintiff filed his Fifth Amended Complaint ("FAC") on January 30, 2008.   (Doc. 35.)   The First Cause of Action alleges assault against all Defendants; the Second Cause of Action alleges battery against all Defendants; the Third Cause of Action alleges false arrest and imprisonment with a warrant against all Defendants; the Fourth Cause of Action alleges defamation by slander against Cardwood; the Fifth Cause of Action alleges a violation of Title 42, United States Code, Section 1983 against all Defendants.

Defendants Merced County, Sheriff's Dept., Taylor and Spencer filed their answer on February 19, 2008.   (Doc. 36.)   Defendant Cardwood filed his answer on February 26, 2008.   (Doc. 37.)

Defendants Merced County, Sheriff's Dept., Taylor and Spencer filed this motion for summary judgment, or in the alternative,

---

[13] A stipulation and order was entered by the Court and parties on August 31, 2007 setting the motion to dismiss hearing date on Plaintiff's previous complaints and permitting supplemental briefings to be filed to address any alleged remaining deficiencies in the Fourth Amended Complaint₁ on the pending motions to dismiss. (Doc. 18.)

1  summary adjudication on May 5, 2009.  (Doc. 64.)  Defendants seek

2  judgment on the grounds that Plaintiff cannot 1) establish his

3  federal constitutional claims, 2) overcome the qualified immunity

4  of the individual defendants, or 3) establish Monell liability of

5  the County of Merced.  Defendant also argues the state law claims

6  should be dismissed because the deputies 4) acted lawfully, and 5)

7  Plaintiff lacks evidence to create a genuine issue of material

8  fact.

9      Plaintiff filed his opposition to summary judgment or, in the

10 alternative, summary adjudication on July 1, 2009. (Doc. 77.)

11 Plaintiff opposes summary judgment on grounds that triable issues

12 of material fact exist as to his constitutional claims and state

13 law theories.  Plaintiff argues Defendant's deputies unlawfully

14 searched and seized him in violation of is Fourth Amendment rights.

15 Plaintiff further contends that neither the County of Merced nor

16 the individual defendant deputies are entitled to qualified

17 immunity or any protections under the California Government Code.

18

19                    **IV.   Legal Standards**.

20

21 **A.   Standard of Review**.

22      Summary judgment is appropriate when "the pleadings, the

23 discovery and disclosure materials on file, and any affidavits show

24 that there is no genuine issue as to any material fact and that the

25 movant is entitled to judgment as a matter of law."  Fed. R. Civ.

26 P. 56(c).  A party moving for summary judgment "always bears the

27 initial responsibility of informing the district court of the basis

28 for its motion, and identifying those portions of the pleadings,

1   depositions, answers to interrogatories, and admissions on file,

2   together with the affidavits, if any, which it believes demonstrate

3   the absence of a genuine issue of material fact." *Celotex Corp. v.*

4   *Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks

5   omitted).

6        Where the movant will have the burden of proof on an issue at

7   trial, it must "affirmatively demonstrate that no reasonable trier

8   of fact could find other than for the moving party." *Soremekun v.*

9   *Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *see also*

10   *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir.

11   2003) (noting that a party moving for summary judgment on claim as

12   to which it will have the burden at trial "must establish beyond

13   controversy every essential element" of the claim) (internal

14   quotation marks omitted).  With respect to an issue as to which the

15   non-moving party will have the burden of proof, the movant "can

16   prevail merely by pointing out that there is an absence of evidence

17   to support the nonmoving party's case." *Soremekun*, 509 F.3d at

18   984.

19        When a motion for summary judgment is properly made and

20   supported, the non-movant cannot defeat the motion by resting upon

21   the allegations or denials of its own pleading, rather the

22   "non-moving party must set forth, by affidavit or as otherwise

23   provided in Rule 56, 'specific facts showing that there is a

24   genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby,*

25   *Inc.*, 477 U.S. 242, 250 (1986)).  "Conclusory, speculative

26   testimony in affidavits and moving papers is insufficient to raise

27   genuine issues of fact and defeat summary judgment." *Id.*

28        To defeat a motion for summary judgment, the non-moving party

must show there exists a *genuine* dispute (or issue) of *material* fact.  A fact is "material" if it "might affect the outcome of the suit under the governing law."   *Anderson*, 477 U.S. at 248.  "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.    In ruling on a motion for summary judgment, the district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

**B.  Section 1983**.

       Plaintiff brings this lawsuit under 42 U.S.C. § 1983, which provides a cause of action "against any person acting under color of law who deprives another 'of any rights, privileges, or immunities secured by the Constitution and laws' of the United States."  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003)(quoting 42 U.S.C. § 1983).  "The rights guaranteed by section 1983 are 'liberally and beneficently construed.'"  *Id.* (quoting *Dennis v. Higgins*, 498 U.S. 439, 443 (1991).

       To establish liability under 1983, a plaintiff must show 1) that he has been deprived of a right secured by the United States Constitution or a federal law, and 2) that the deprivation was effected "under color of state law."   *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003).

C. __Monell Liability__

Local governments[14] are "persons" subject to suit for "constitutional tort[s]" under 42 U.S.C. § 1983. *Haugen v. Brosseau*, 339 F.3d 857, 874 (9th Cir. 2003) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 n.55 (1978)). "[T]he legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Id*. at 690. These bodies "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's deputies...[or for] deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Id*. at 690-91. Although a local government can be held liable for its official policies or customs, it will not be held liable for an employee's actions outside of the scope of these policies or customs.

To establish municipal liability, a plaintiff must prove the existence of an unconstitutional municipal policy. *Haugen*, 351 F.3d at 393.

> [I]t is when execution of a government's policy or custom, whether made by its law-makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the

[14] Although *Monell* dealt with a municipal government's liability under § 1983, the standard there announced was more broadly framed in terms of "a local government." *Brass v. County of L.A.*, 328 F.3d 1192, 1198 (9th Cir. 2003).

16

1      government as an entity is responsible under § 1983."

2 *Monell,* 436 U.S. at 694.  There are various ways a plaintiff may

3 prove the existence of an unconstitutional municipal policy under

4 the *Monell* doctrine.  These are discussed in context below.

5

6 D.  <u>Suits Against Government Officials: Official Capacity and</u>

7      <u>Individual Capacity Suits</u>.

8      Suits against an official in her or his official capacity are

9 treated as suits against the entity on whose behalf that official

10 acts.  In such suits, the real party in interest becomes the entity

11 for which the official works.  *Hafer v. Melo*, 502 U.S. 21, 25

12 (1991).  A federal action for monetary damages against an

13 individual State official acting in his official capacity is barred

14 by the Eleventh Amendment in the same way that an action against

15 the State is barred.  *Doe v. Lawrence Livermore Nat'l Lab.*, 131

16 F.3d 836, 839 (9th Cir. 1997).

17      In contrast, "[p]ersonal-capacity suits seek to impose

18 personal liability upon a government official for actions [taken]

19 under color of state law."  *Dittman v. California*, 191 F.3d 1020,

20 1027 (9th Cir. 1999)(citing *Kentucky v. Graham*, 473 U.S. 159, 165

21 (1985)) (internal quotations omitted).  To establish personal

22 liability in a § 1983 action, it is enough to show that the

23 official, "acting under color of state law, caused the deprivation

24 of a federal right."  *Hafer*, 502 U.S. at 25 (internal quotations

25 omitted).  Public officials sued in their personal capacity may

26 assert personal liability defenses, such as qualified immunity.

27 *Dittman,* 191 F.3d at 1027.

28

**E.    Summary Judgment in the Qualified Immunity Context.**

In this case, Defendant County of Merced asserts the defense of qualified immunity on behalf of all the individual defendants. Qualified immunity is based on the policy concern that few individuals would enter public service if they risked personal liability for their official decisions. *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). The immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Hunter v. Bryant*, 502 U.S. 224, 228 (1991), and "spare[s] a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). Qualified immunity is not a defense on the merits; it is an "entitlement not to stand trial or face the burdens of litigation" that may be overcome only by a showing that (1) a constitutional right was in fact violated and (2) no reasonable deputy could believe defendant's actions were lawful in the context of fact-specific, analogous precedents. *Saucier v. Katz*, 533 U.S. 194, 200-02 (2001).

## V.   Discussion.

**A.    Plaintiff's First and Second Causes of Action**

Plaintiff's First and Second Causes of Action allege that County Defendants committed assault and battery against Plaintiff on December 6, 2006. Defendants seek summary judgment as to these causes of actions on grounds that there is no genuine issue of material fact to show that County Defendants assaulted or battered Plaintiff. Plaintiff does not oppose Defendants' motion, abandoning both causes of action. (Plaintiff's Opposition ("Pl.'s

1  Opp."), Doc. 77, 2:3-2:9, filed July 1, 2009.)  Specifically,

2  Garcia concedes that he "has developed no evidence to support his

3  first and second causes of action for assault and battery."  (*Id.*)

4      Plaintiff's Fifth Amended Complaint also contains allegations

5  concerning a "conspiracy" by County Defendants against Plaintiff.

6  These allegations are not separately enumerated as a cause of

7  action.  In his opposition, Plaintiff abandons any allegations of

8  a conspiracy against County Defendants, conceding that he "has no

9  evidence of a conspiracy."  (*Id.* at 2:8-2-9.)

10      Accordingly, summary judgment is GRANTED in favor of all

11  moving Defendants as to Plaintiff's first cause of action for

12  assault and his second cause of action for battery.

13      Summary judgment is also GRANTED in favor of County Defendants

14  as to the conspiracy allegations contained in Plaintiff's Fifth

15  Amended Complaint.

16

17  B.   **Fourth Amendment Claims**

18       1.   **Deputy Taylor**

19      Plaintiff raises a number of arguments concerning Deputy

20  Taylor's conduct in support of his Fourth Amendment claims: (a)

21  that Deputy Taylor violated his Fourth Amendment rights because he

22  lacked probable cause to conduct a "reverse-sting" operation; (b)

23  Deputy Taylor misrepresented facts and omitted material information

24  from the Oral Affidavit of Probable Cause, leading to an improper

25  search of Plaintiff's office; and (c) there was no probable cause

26

27

28

1   to detain Plaintiff following the reverse sting operation.[15]

2

3              a.   Probable Cause for Reverse Sting

4        Plaintiff first alleges that Deputy Taylor violated his Fourth

5   Amendment rights because he did not have probable cause to conduct

6   a "reverse-sting" operation, transferring drugs to Plaintiff in the

7   process.   Plaintiff states that his Fourth Amendment rights were

8   violated because Taylor "could not corroborate any of Plunkett's

9   bogus allegations ... so they set up an equally bogus reverse sting

10  operation." (Doc. 77, 11:16-11:19.)  Plaintiff frames the relevant

11  issue as "whether Taylor had probable cause to plant the drugs on

12  Garcia as a pretext to obtain a search warrant."   (Id. at 10:6-

13  10:8.)

14       This argument partially fails because Plaintiff does not

15  provide any authority for the proposition that the Fourth Amendment

16  requires probable cause to conduct an undercover investigation or,

17  in this instance, a reverse sting operation.    It is well-

18  established that being a target of a law enforcement investigation

19  – absent some allegation of a constitutional violation such as the

20  fabrication of evidence – is not in and of itself actionable under

21  Section 1983.  *See United States v. Mayer*, 503 F.3d 740*,* 749-50

22  (9th Cir. 2007) (stating that "there is no requirement of probable

23  cause when a law enforcement agency investigates an individual or

24  group.");  *see also Shields v. Twiss*, 389 F.3d 142, 150-51 (5th

25

26       [15] Although pled as a single cause of action, Plaintiff's Fifth
    Amended Complaint contains several non-enumerated claims for relief
27  under the Fourth Amendment.   For purposes of this motion, each
    subsidiary theory for relief under the Fourth Amendment is treated
28  as its own separate and distinct claim.

1   Cir. 2004) (dismissing allegations of "unreasonable investigation"

2   because appellant "pointed to no legal basis for a § 1983 action of

3   this sort, and the court knows of none.").

4       The Ninth Circuit recently reaffirmed this principle in

5   *Sanders v. City and County of San Francisco*, 226 F. App'x 687, 688

6   (9th Cir. 2007).   In *Sanders*, Plaintiffs, a former city police

7   chief and former deputy police chief, brought a § 1983 action

8   against the City, its former district attorney, and board of

9   supervisors, alleging that these defendants violated their

10  constitutional rights when they directed and participated in a

11  criminal investigation against the chiefs without probable cause.

12  The Ninth Circuit held that there is no requirement to have

13  probable cause before commencing a criminal investigation:

14          The district court properly dismissed appellants'
            claim that Hallinan violated their constitutional
15          rights when he directed and participated in a criminal
            investigation into Sanders's and Robinson's police
16          department activities, despite lacking probable cause
            to do so. Appellants point to no case law that
17          supports the proposition that probable cause must
            exist before an investigation can commence. That is
18          not surprising, given that the impetus behind criminal
            investigations is to develop probable cause.
19

20  (*Id*. at 689.)

21      As *Macon* and *Sanders* demonstrate, Deputy Taylor did not

22  violate Plaintiff's constitutional rights when he coordinated a

23  sting operation which transferred methamphetamine from a

24  confidential informant to Plaintiff to test Plaintiff's willingness

25  to knowingly transport narcotics into the jail.   The sting

26  operation was a pre-indictment investigation into possible criminal

27  behavior by the Plaintiff, which does not require a probable cause

28  determination. *See id; Mayer*, 503 F.3d at 749-50. As the Ninth

21

1  Circuit stated in *United States v. Aguilar*, 883 F.2d 662, 705 (9th

2  Cir. 1989), requiring a search warrant prerequisite to an

3  investigation "would be tantamount to prohibiting a criminal

4  investigation in its entirety, because the information learned from

5  undercover government agents is often the basis for probable

6  cause."[16]  Under the facts of this case, it is difficult to see how

7  such a criminal investigation violates any law, constitutional or

8  otherwise.

9      It is equally well-established that the protections of the

10  Fourth Amendment are implicated only if there has been a search or

11  seizure under Fourth Amendment.  To the extent Plaintiff argues

12  that he has a reasonable expectation of privacy in being free from

13  a sting operation conducted by government agents and their

14  informants on public property, his claim is foreclosed by Supreme

15  Court and Ninth Circuit precedents.[17]

16

17      [16]  Under slightly different facts in *United States v. Aguilar*,

18  883 F.2d 662, 705 (9th Cir. 1989), the Ninth Circuit discussed
   undercover operations in the context of probable cause: "A search

19  warrant requirement for undercover government agents to investigate
   an organization concededly engaging in protected first amendment

20  activities indeed would prohibit law enforcement officials from
   using an indispensable method of criminal investigation appropriate

21  in any other circumstance ... [i]n many cases, a search warrant
   prerequisite would be tantamount to prohibiting a criminal

22  investigation in its entirety, because the information learned from
   undercover government agents is often the basis for probable cause.

23  The Constitution does not impose this high cost in the present

24  case."
       [17]  During oral argument, following a discussion of the

25  relevant case authorities on point, Plaintiff continued to

26  "disagree that there was probable cause for the sting operation in
   the first place."  Plaintiff's arguments are misplaced.  The

27  protections of the Fourth Amendment only apply if there has been a
   search or seizure, a circumstance not present in this case.  It is

28  well-established that not every investigatory technique is a search

The relevant Fourth Amendment language provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  The protections of the Fourth Amendment only apply if there has been a search or seizure, making the threshold inquiry in every Fourth Amendment analysis whether a search or seizure has occurred.  A search is an intrusion on a person's "reasonable expectation of privacy" and requires Garcia to show both a subjective expectation of privacy and that the expectation is objectively reasonable.  *United States v. Sandoval*, 200 F.3d 659 (9th Cir. 2000).

There is no evidence to suggest that Plaintiff had a subjective expectation of privacy in any aspect of the reverse sting operation or that his privacy expectation, if established, was objectively reasonable.  Viewing all the evidence in his favor, as required on a motion for summary judgment, Plaintiff cannot to establish a subjective expectation of privacy in the sting operation - or the courthouse where the sting operation took place

---

for fourth amendment purposes.  *See Maryland v. Macon*, 472 U.S. 463, 470 (1985) ("The use of undercover officers is essential to the enforcement of vice laws ... [a]n undercover officer does not violate the Fourth Amendment merely by accepting an offer to do business that is freely made to the public."); *United States v. Mayer*, 503 F.3d 740*,* 750 (9th Cir. 2007) (stating that "undercover operations, in which the agent is a so-called 'invited informer,' are not 'searches' under the Fourth Amendment."); *United States v. Dovali-Avila*, 895 F.2d 206, 207-08 (5th Cir. 1990) (use of a well-trained and reliable narcotics dog on vehicles passing through a fixed border patrol checkpoint does not violate Fourth Amendment rights); *United States v. Hoffa*, 437 F.2d 11, 14 (6th Cir. 1971) (taping of a conversation between an information and a person being investigated does not violate Fourth Amendment rights when the consent of the informant is given.").

1  - because Defendant Taylor never met with Task Force Agents in

2  Plaintiff's office or on Plaintiff's property.   No evidence

3  suggests that the parties ever crossed paths or shared a jail

4  meeting room.   Plaintiff did not own the physical property used in

5  the sting; nor did he own the walkway adjacent to the courthouse.

6      On the issue of objective reasonableness, Garcia did not have

7  a possessory interest in the items used in the sting; Garcia could

8  not exclude others from the courtroom or the sidewalk adjacent to

9  the courthouse; Garcia took no precautions to maintain his privacy

10 outside the courthouse, as he accepted the Bulger tobacco package

11 from Pluckett on the courthouse steps, a public walkway.   This

12 evidence cuts against Plaintiff's claims of an unreasonable search

13 under the Fourth Amendment.   *See, e.g., United States v. McCaster*,

14 193 F.3d 930, 933 (8th Cir. 1999); *LaDuke v. Nelson*, 762 F.2d 1318,

15 1326 n.11 (9th Cir. 1985).

16     Plaintiff's allegations do not provide a basis for a Fourth

17 Amendment privacy violation by coordinating the sting.[18]   To the

18 extent that Plaintiff argues that Defendant Taylor violated his

19 Fourth Amendment rights because he did not have probable cause to

20 conduct a "reverse-sting" operation, Plaintiff's claim is

21

22     [18] Although somewhat unclear, it also appears Plaintiff raises

23 arguments similar to those contained in a line of cases holding

   "where it is the government that initiates the alleged criminal

24 activity and where the government either purchases or supplies the

   drugs, which party initiates the alleged crime is relevant and

25 important in assessing the degree of government involvement in

   setting up the crime." *See, e.g., Hampton v. United States*, 425

26 U.S. 484, 491 (1976). Plaintiff's arguments in this regard are

27 unpersuasive, as the Hampton line of cases involved criminal

   appeals.

28

**24**

1 foreclosed by well-established Ninth Circuit precedent. It is
2 equally clear that Plaintiff does not have a "reasonable
3 expectation of privacy" in a pre-indictment sting operation
4 conducted by trained law enforcement officers on public property.
5 Plaintiff's attempt to expand the outer boundaries of Fourth
6 Amendment jurisprudence is unavailing. The sting did not
7 constitute a search under the Fourth Amendment. This law
8 enforcement conduct is not actionable.

9    Deputy Taylor's motion for summary adjudication on Plaintiff's
10 Fourth Amendment claim for lack of probable cause to conduct a
11 sting operation is GRANTED.

12

13          b.   Oral Affidavit of Probable Cause

14    The heart of Garcia's civil rights challenge is that Affiant
15 Taylor caused Garcia's office to be improperly searched without
16 probable cause because Taylor misrepresented facts and omitted
17 material information from Taylor's Oral Affidavit of Probable
18 Cause, which he executed and submitted in support of the
19 application for a search warrant for Plaintiff's law office and
20 automobile. Plaintiff presents three primary theories for
21 liability under the misrepresentation/omission framework: (1)
22 Deputy Taylor failed to disclose the criminal history of the
23 informant, Mr. Plunkett, to Judge Dougherty; (2) Deputy Taylor
24 misrepresented to Judge Dougherty that one of the Task Force Agents
25 observed Garcia open the Bugler pouch, when he did not; and (3) the
26 warrant was overbroad.

27    A search made without probable cause violates the Fourth
28 Amendment right to be free from unreasonable searches and can be

25

the basis of a claim under 42 U.S.C. § 1983.  An officer generally has qualified immunity from a claim that he lacked probable cause, absent a showing that a reasonably well-trained officer in his position would have known that his warrant affidavit failed to establish probable cause.  *Malley v. Briggs*, 475 U.S. 335 (1986).  Where, as here, the officer is accused of deliberately omitting information from the affidavit making it materially false and misleading, and claims qualified immunity, the Ninth Circuit has tailored this inquiry.[19]  Specifically, in order to survive summary judgment, plaintiff must: (1) make a substantial showing that Deputy Taylor's warrant application contained a false statement or omission that was deliberately false or made with reckless disregard for the truth; and (2) establish that if the offending material is excised (and/or the omission is included), the information provided to the Magistrate would be insufficient to establish probable cause.  *Lombardi v. City of El Cajon*, 117 F.3d 1117, 1124-26 (9th Cir. 1997); *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995); *see also Liston v. County of Riverside*, 120 F.3d 965, 972-73 (9th Cir. 1997).

Whether the statements were deliberately false is ultimately

---

[19] In *Franks v. Delaware*, 438 U.S. 154 (1978), the Court held that when "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause," the search warrant is void and improper. Franks, 438 U.S. at 155-156. The Ninth Circuit has subsequently extended Franks violations to omissions as well as misrepresentations. In *United States v. Stanert*, 762 F.2d 775 (9th Cir. 1985), *amended by* 769 F.2d 1410 (9th Cir. 1985), the court held that deliberate or reckless omissions of facts that mislead can negate a facial showing of probable cause. *See Lombardi v. City of El Cajon*, 117 F.3d 1117, 1122 (9th Cir. 1997).

1  a factual issue for the jury, but the plaintiff must at least make

2  a "substantial showing" on this issue to survive summary judgment.

3  *See Lombardi*, 117 F.3d at 1126, n.6; *Hervey*, 65 F.3d at 790-91.

4  Whether the alleged omissions are material is a question of law for

5  the Court to decide.  *Hervey*, 65 F.3d at 789.  If the Plaintiff can

6  satisfy both of the above requirements, then the officer is not

7  entitled to qualified immunity and the claim proceeds to trial for

8  the  jury  to  determine  whether  the  officer  deliberately  or

9  recklessly included false statements (or omitted information) in

10 the affidavit.  *Id.* at 791.

11

12            i. *Introduction to Plaintiff's Allegations*

13       In  order  for  Deputy  Taylor  to  be  liable  under  the

14 misrepresentation/omission  framework,  Plaintiff  must  submit

15 admissible  evidence  supporting  his  allegation  that  Taylor

16 deliberately or recklessly omitted information from his affidavit

17 for a search warrant.  Plaintiff submits that all of Plunkett's

18 information was second layer hearsay and that Taylor did not inform

19 Judge Dougherty about Pluckett's specific criminal history and

20 bolstered Mr. Plunkett's credibility in the affidavit by omitting

21 his true motive for helping with the investigation - avoidance of

22 a "third strike."[20]

23       Garcia relies heavily on a recent Ninth Circuit case, *United*

24

25            [20]  Plaintiff  also  claims  that  "nothing  Plunkett  said  was
26 against his penal interest."   (Doc. 77, 14:1-14:3.)   This is not
   entirely accurate.   *See United States v. Terry-Crespo*, 356 F.3d
27 1170,  1176  (9th  Cir.  2004)  (observing  that  exposure  to  legal
   sanction for providing false information increases reliability of
28 tip).

1  *States v. Stadnisky*, 309 F. App'x 185 (9th Cir. 2009), to support

2  his "omission" arguments, contending a minimum standard of required

3  conduct (i.e., corroboration and disclosure) under the law

4  enforcement misrepresentation and/or omission analysis.  Relying on

5  *Stadnisky*, Plaintiff argues that "Taylor and Cardwood did not even

6  take those most rudimentary steps ... they never investigated

7  Plunkett's previous reliability and helpfulness as an informant."

8  (Doc. 77, 12:11-12:14.)  However, Plaintiff's reliance on *Stadnisky*

9  is misplaced for a number of reasons, most notably that the

10  detectives in Stadnisky relied on information obtained from a

11  confidential informant, not a known and disclosed informant such as

12  Mr. Plunkett.  *Stadnisky* does not support Plaintiff's litigation

13  position.  If anything, *Stadnisky* weakens it.  *See Florida v. J.L.*,

14  529 U.S. 266, 271 (2000) (stating that a known informant's tip is

15  thought to be more reliable than an anonymous informant's tip

16  because an anonymous informant typically cannot be questioned about

17  the basis for knowing the information or motive for providing the

18  tip, nor can the anonymous informant be held accountable for

19  providing false information in violation of the law.).

20

21                    **ii. *Plunkett's Criminal History***

22       Plaintiff first maintains that Deputy Taylor deliberately

23  omitted Plunkett's criminal history from his Oral Affidavit and

24  that this omission materially altered Judge Dougherty's probable

25  cause finding.[21]  A review of the affidavit reveals that Taylor did

26  _____

27       [21] Plaintiff also alleges that Plunkett originally claimed that
    guards were responsible for smuggling drugs into the prison, not

28  Garcia or Robledo.  Plaintiff claims that Taylor knew of Plunkett's

not recite Plunkett's specific criminal history, but did disclose

that Plunkett was in custody at the Merced County Jail on theft

charges and that his case was ongoing:

> In the last twenty days, your Affiant began conducting investigation regarding distribution of methamphetamine in Merced County. On one-ten-two thousand and six, I was contacted by Merced County Sheriff's Department Correctional Sergeant Mark Pace. Sergeant Pace informed me that he had received information from Robert Anthony Plunkett, date of birth five-ten-nineteen-seventy, an inmate at the Merced County Jail, that narcotics were being smuggled into the Merced County Jail by a private attorney ... On one-thirty-two thousand and six, Merced Multi-Agency Narcotic Task Force Agent Paul Johnson and I met with and conducted an interview with Robert Anthony Plunkett at the Merced County Correctional Facility. Plunkett explained to Agent Johnson and I that he wished to provide information to us, regarding a criminal organization that was smuggling narcotics into Merced County Jail. Plunkett explained to Agent Johnson and I that he was currently in custody for theft and that he was housed in a westside lock-down area of the facility.

("Verbal Search Warrant," Doc. 58-7, Exh. A, pgs. 6-7.)

Based on Taylor's representations in his Oral Affidavit, Judge Dougherty knew the sting operation was based in large part on statements by a known criminal informant, who was charged with a crime of moral turpitude. *See Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013, 1020 (9th Cir. 2005) (holding that "crimes of theft are crimes involving moral turpitude."). However, the record indicates that Plunkett was previously convicted of violating Health and Safety Code § 11359, misdemeanor possession of marijuana; Health and Safety Code § 11360, felony sale of marijuana; Health and

---

previous allegations, yet did not include them in his Affidavit. The affidavit demonstrates Taylor conveyed this information - or some limited version of it - to Judge Dougherty.

29

Safety Code § 11364, possession of drug paraphernalia; Health and Safety Code § 11377, misdemeanor possession of a controlled substance without a prescription; Health and Safety Code § 11378, felony possession of a controlled substance for sale; Health and Safety Code § 11379, felony transportation of a controlled substance into California; Vehicle Code § 10851, felony vehicle theft; Penal Code § 459, burglary; and Penal Code § 451(c), arson.[22] Despite Plunkett's lengthy criminal history, including convictions for crimes involving moral turpitude and the sale/transport of narcotics, Deputy Taylor only disclosed Plaintiff's recent theft charge.  Taylor's omission of Plaintiff's specific criminal history rises to the level of "deliberate falsehood or reckless disregard for the truth" if found to be true.

The omission of Mr. Plunkett's specific criminal record does not per se foreclose a finding of probable cause.  The remainder of the search warrant and affidavit recount the events that do not necessarily support Judge Dougherty's practical, common-sense decision whether, given all the legitimate circumstances set forth in the affidavit before him, there was a fair probability that contraband or evidence of a crime would be found on Plaintiff's person or at the Plaintiff's law office.  *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).  The affidavit recounts testimony from Deputy Taylor that he partially corroborated Mr. Plunkett's statements concerning: Robledo's involvement with narcotics;

---

[22] A detailed review of Plaintiff's criminal history can be found in Doc. 77 at 2:23-2:28. In his deposition, Plaintiff stated he had felony convictions for "auto theft, burglary, and arson." (Dep. Plunkett 109:15-109:23.)

Plunkett's own relationship with Robledo; Robledo's relationship with the Plaintiff; the general nature and persons involved in the smuggling ring; and the importance of "Bugler" packaging to smuggle narcotics into the jail.  (Doc. 58-7, Exh. A, pgs. 6-10.)

Defendants argue that absent Plunkett's specific criminal history, the affidavit sufficiently states evidence supporting the probability that objects of the prospective search - e.g., the methamphetamine used in the sting, the Bugler tobacco pouch, drug paraphernalia, etc. - might be found at Plaintiff's law office, in his car, or on his person.  However, probable cause rested in large part on Plunkett's representations concerning Garcia's involvement in the smuggling ring; the information allegedly omitted by Deputy Taylor goes directly to the level of his credibility, which was not presented to the issuing judge.

### iii. *Plaintiff's Remaining Allegations*

Plaintiff argues that the single most significant material misrepresentation to the judge in the oral affidavit is the Task Force Agents' misrepresentation in the oral affidavit that he observed Garcia open the Bugler pouch.  Agent Cardwood's Oral Affidavit stated that he observed Garcia open the flap, close it, and walk back to his office with the tobacco pouch in his hand. Plaintiff testifies that he never opened the flap of the tobacco bag, but instead only accepted the Bugler tobacco pouch from Plunkett and took it to his office.  Plaintiff also alleges that as Plunkett handed him the Bugler pouch, he stated, "if there's anything else in here besides tobacco, you take it back to Sylvia or wherever you got it."

31

1    Although these specific allegations concern Deputy Taylor -
2 not Agent Cardwood, Deputy Taylor stated in his Affidavit that
3 "Garcia took the package from him, which was a Bugler cigarette
4 pack containing methamphetamine, which he had already looked at."
5 (Doc. 58-7, Exh. A, pg. 13.)   Although Taylor claims he did not
6 personally witness Garcia open the Bugler pouch, he incorporated
7 Cardwood's observations about Plaintiff looking in the pouch in his
8 testimony to the issuing judge which, had the information not been
9 included, would have resulted in a finding of no probable cause.
10 With respect to Plaintiff's statement to Plunkett when he handed
11 over the Bugler pouch, it is undisputed that Deputy Taylor
12 monitored the transaction between Plunkett and Plaintiff via CB
13 radio.[23]   However, Deputy Taylor did not include Plaintiff's
14 exculpatory statement in his Oral Affidavit to the issuing judge.

15    Omitting, *arguendo*, the statement about Garcia "looking at
16 it," and adding Plaintiff's statements concerning the package's
17 contents, as well as Plunkett's extensive criminal history, does
18 the affidavit still contain sufficient probable cause for a search
19 warrant against Garcia and his law office?   A "totality of the
20 circumstances test" applies to determine whether a search warrant
21 is supported by probable cause. *Gates*, 462 U.S. at 238-39. .   This
22 test requires "a practical, common-sense decision whether, given
23 all the circumstances set forth in the affidavit, including the
24 'veracity' and 'basis of knowledge' of persons supplying hearsay
25 information, there is a fair probability that contraband or

26

27

28    [23] Specifically, Plaintiff listened to the "wire" using his CB
radio.   (Doc. 64, 4:18-4:20.)

evidence of a crime will be found in a particular place." *United States v. Feeney*, 984 F.2d 1053, 1055 (9th Cir. 1993).

The affidavit states that Deputy Taylor met with Mr. Plunkett between three and ten times to investigate Plunkett's allegations concerning the jailhouse drug smuggling ring.  Taylor purportedly confirmed Plunkett's information (and his credibility) with outside sources.  He then contacted Special Agent Cardwood and organized the reverse sting and obtained fourteen ounces of methamphetamine from the Merced County Sheriff's Department.  Deputy Taylor placed the methamphetamine in a Bugler brand cigarette package, per the reported modus operandi.  The methamphetamine was in plain view upon opening the Bugler package according to Taylor and Cardwood, which is categorically contradicted by Plaintiff.[24]  This fact can only be resolved by the trier of fact, not the court.

According to the affidavit, the "sting" operation required Plaintiff to contact John Garcia at the Merced County Superior Courthouse and give Garcia the Bugler tobacco pouch.  Plunkett was to tell Garcia that he was on a "pass" from Sandy Mush Correctional Facility and that the package was for Robledo.  After two unsuccessful attempts to give Garcia the Bugler pouch, Plunkett

---

[24] Plaintiff avers that Cardwood misled the judge when he stated the methamphetamine was "outside the bag" and "outside the pouch."  (Doc. 73, 13:27-13:28.)  Plaintiff essentially argues Cardwood's misrepresentation created an inference that the methamphetamine was in "plain view," leading the issuing judge to find probable cause for knowing possession of methamphetamine. (Id. at 1:27-1:28.)  Drawing all inferences in Plaintiff's favor, coupled with the factual dispute about whether Plaintiff opened the Bugler pouch during his meeting with Plunkett, Cardwood's statement that the meth was "outside the bag," there is a material factual dispute as to Plaintiff's knowledge of a controlled substance.

approached Garcia outside the courthouse.   The two walked to
Garcia's office together, and Plunkett told Garcia he was on a
"pass" from jail.   At this point, Plunkett produced the Bugler
tobacco pouch containing the methamphetamine and handed it to
Garcia.   Garcia took the Bugler tobacco pouch from Plunkett and
continued walking to his office.   Other Task Force members observed
the above events and confirmed that Plaintiff possessed the Bugler
package containing the methamphetamine when he entered his office
building.   However, there is a total conflict in the evidence
whether Plaintiff had knowledge of the presence of the controlled
substance, specifically whether the meth was in "plain view" and
whether Plaintiff opened the Bugler flap.

Although it is undisputed that the Bugler pouch contained
fourteen grams of methamphetamine, Plaintiff took possession of the
pouch, and continued on to his office, the dispute is whether
Plaintiff opened the tobacco package flap to show knowledge of the
presence of the controlled substance, which prevents the
establishment of an essential element of the crime existed to
believe that Plaintiff would knowingly accept a Bulger tobacco
package with meth for transport to Plaintiff's incarcerated client
at the jail, which Plaintiff took to his office.

To determine if "what remains [is] sufficient to justify the
issuance of the warrant," the missing information must be added to,
and the misrepresentations subtracted from, Deputy Taylor's
affidavit.   *Baldwin v. Placer County*, 418 F.3d 966, 970 (9th Cir.
2005); *Liston*, 120 F.3d at 973.   Here, the surviving assertions do
not as a matter of law support a finding that there was probable
cause to believe that Garcia knowingly transported the

methamphetamine to his office or that some portion of it remained at the office at the time Taylor and Cardwood made their oral affidavits.  The judge, if Plaintiff's facts are true, did not have cause to believe that a search of Garcia's office would lead to the recovery of the methamphetamine and other incriminating evidence related to a scheme to knowingly transport meth to the jail for prisoners.

### iv. *Conclusion*

For the reasons set forth above, Deputy Taylor's motion for summary adjudication based upon qualified immunity is DENIED. Deputy Taylor's misrepresentations and omissions, taken together, were material to the judge's determination of probable cause and had the statements been truthful and the omissions added, no probable cause would have existed.  Probable cause to search rested on Plaintiff's knowledge that the Bugler bag contained methamphetamine and, to some extent, on Mr. Plunkett's credibility. The information allegedly falsified and omitted by Deputy Taylor goes directly to the level of Plaintiff's knowledge and Plunkett's credibility.

A reasonable jury could determine that Deputy Taylor acted with at least recklessness in filling out the affidavit, given the importance of Plaintiff's knowledge and Plunkett's credibility to a probable cause determination.  Deputy Taylor is not entitled to qualified immunity on Plaintiff's judicial deception claim.

### c.   Stop of Plaintiff's Vehicle

Plaintiff argues that there was no probable cause to stop and

1  detain him following the reverse sting operation.  He criticizes
2  the tactics used but does not squarely address the issue of
3  probable cause for post-sting events.  Deputy Taylor contends that
4  Plaintiff cannot maintain his constitutional challenge because he
5  was not present at the vehicle stop.  Assuming Plaintiff's
6  challenge is permissible, Deputy Taylor argues that probable cause
7  existed to effectuate a warrantless detention of Plaintiff until he
8  obtained search warrant for Plaintiff's law office and automobile.
9  Deputy Taylor also raises the defense of qualified immunity.  All
10 of this is abrogated if Plaintiff's testimony is believed.

11      A peace officer is entitled to qualified immunity in a civil
12 rights action if the district court determines that, in light of
13 clearly established law governing the conduct in question at the
14 time of the challenged conduct, the officer could reasonably have
15 believed that the conduct was lawful.  *Levine v. City of Alameda*,
16 525 F.3d 903, 906-07 (9th Cir. 2008).  This determination requires
17 a two-step analysis.  First, whether the law governing the
18 official's conduct was clearly established at the time the
19 challenged conduct occurred.  *Id*.  Second, whether, under that
20 clearly established law, a reasonable official would have believed
21 the conduct to be unlawful.  *Id*.  However, even before engaging in
22 this inquiry, the Court must first consider the threshold question
23 of whether the facts viewed in the light most favorable to the
24 party asserting the injury show the officer's conduct violated a
25 constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).
26 "If no constitutional right would have been violated were the
27 allegations established, there is no necessity for further
28 inquiries concerning qualified immunity." *Id*.

The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.  In conformity with the rule at common law, a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citing *United States v. Watson*, 423 U.S. 411, 417-424 (1976)).

"Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." *United States v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999) (quoting *United States v. Garza*, 980 F.2d 546, 550 (9th Cir. 1992)).  Probable cause does not require overwhelmingly convincing evidence, but only "reasonably trustworthy information."  *Saucier v. Katz*, 533 U.S. 194, 207 (2001).

"Probable cause is an objective standard and the officer's subjective intention in exercising his discretion is immaterial in judging whether his actions were reasonable for Fourth Amendment purposes." *John v. City of El Monte*, 505 F.3d 907, 911 (9th Cir. 2007) (citing *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007)).  "It is essential to avoid hindsight analysis, i.e., to consider additional facts that became known only after the arrest was made." *Id.* (citing *Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989)).

Plaintiff urges that Deputy Taylor is not entitled to qualified immunity with respect to the stop of his vehicle and

subsequent arrest/detention.  Specifically, Plaintiff states that "there are material issues whether Taylor .. [h]ad probable cause to plant drugs on Garcia, then stop him ...."  There is substantial evidence, including Plaintiff's own deposition testimony, that establishes Deputy Taylor's was not present when Plaintiff's car was stopped and he was arrested/detained by law enforcement personnel.  However, if Plaintiff's testimony is believed, there was no basis for the search or any of the resulting events.

In *Torres v. City of Los Angeles*, 548 F.3d 1197 (9th Cir. 2008), the Ninth Circuit affirmed the dismissal of Plaintiffs' case against the Detective Defendant because "it is undisputed that Detective Hickman was not present when Torres was arrested, and there is no evidence that Detective Hickman instructed the other detectives to arrest Torres or that any of those detectives consulted with her before making the arrest." *Id*. at 1206.  The Ninth Circuit found that the lack of participation – and presence – led to one conclusion: "that there is no evidence of 'integral participation' by Detective Hickman in the alleged constitutional violation." *Id*. *Torres* is consistent with other recent Ninth Circuit authority on the issue. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n. 12 (9th Cir. 2007) (explaining that integral participation requires "some fundamental involvement in the conduct that allegedly caused the violation" and affirming summary judgment in favor of officer who arrived on the scene after the allegedly unconstitutional arrest and officer who provided only crowd control); *Motley v. Parks*, 432 F.3d 1072, 1082 (9th Cir. 2005) (en banc) (affirming grant of summary judgment in favor of government

1  agent who did not participate in the allegedly unconstitutional
2  search).

3      Nevertheless, if Deputy Taylor's affidavit is false, it
4  provided the causal impetus for the vehicle stop on February 6,
5  2006; even if Plaintiff conceded in his December 30, 2008
6  deposition that Deputy Taylor was not present at the vehicle stop
7  and did not use excessive force against him.[25]  Although Taylor was
8  the deputy who obtained the warrant, there would have been no basis
9  to detain Plaintiff if the search had not been conducted.

10
11              ii.  *Did Probable Cause Exist?*

12      The oral affidavit of probable cause to search, while not
13  definitive on the issue of probable cause to make a warrantless
14  arrest,[26] provides a guide for determining the facts at the time of
15  Garcia's stop.   The declaration of probable cause to search
16  Garcia's office and person sets forth: Garcia was the subject of a
17  criminal investigation into his alleged role in an operation
18  involving smuggling contraband into Merced County Jail.   Task Force
19  members claim to have confirmed Garcia's alleged role in the
20  operation and organized a reverse sting whereby a confidential

21

22      [25] It is undisputed that District Attorney Gordon was not
23  present during the vehicle stop.
24      [26] Although the parties frame their arguments in terms of an
   "arrest," there appears to be an argument that Plaintiff was merely
25  detained while the agents obtained a search warrant. *See INS v.*
   *Delgado*, 466 U.S. 210, 216.   Agent Cardwood acknowledges this
26  argument, but gives it short notice.   In his reply he states that
   "Plaintiff was never placed under arrest, only lawfully detained
27  while a search warrant was sought and executed."  (Def.'s Reply,
   3:11-3:14.)  He then assumes there was a warrantless arrest and
28  proceeds into his "probable cause" analysis.

1  informant would transfer to Garcia a Bugler pouch containing
2  fourteen grams of methamphetamine.  On the afternoon of February 6,
3  2006, Garcia took possession of the tobacco pouch containing the
4  methamphetamine and proceeded to his office.  Garcia was in his
5  office a few minutes, then left in his black Volvo.  He was then
6  stopped by an unmarked police vehicle, searched, and placed in
7  handcuffs.

8      Plaintiff does not dispute that he met with the Plunkett and
9  took the Bugler pouch – and the methamphetamine, ostensibly to
10  deliver to Robledo.  In essence, Plaintiff does not dispute he
11  possessed fourteen ounces of methamphetamine on the afternoon of
12  February 6, 2006 or that he left his office minutes later.
13  Plaintiff does dispute his "knowledge" of the contents of the
14  pouch, claiming was not aware the package contained
15  methamphetamine.  Plaintiff argues that this forecloses any finding
16  of probable cause to support a warrantless arrest.

17      Knowing or intentional possession of methamphetamine is a
18  public offense within the meaning of the statute.  See Cal. Pen.
19  Code, § 15(2), (3) (defining "public offense" as violation of the
20  law for which a person may be, inter alia, imprisoned or fined);
21  Cal. Health & Safety Code, §§ 11377, 11378; 21 USC § 844(a).
22  Although Deputy Taylor was not required to be completely accurate
23  in his belief that Plaintiff knowingly possessed the
24  methamphetamine in order to make a warrantless arrest, he was
25  required to have known whether the meth was immediately visible in
26  the pouch to support a believed that Plaintiff knowingly possessed
27  the methamphetamine in order to make a warrantless arrest.

28      Plaintiff claims that he did not open the Bugler package until

**40**

he arrived at his office and therefore did not knowingly possess methamphetamine.   The record demonstrates that Deputy Taylor's belief is completely inconsistent with Plaintiff's description of what was visible when Plaintiff accepted the Bugler package from Plunkett.  Specifically, Plaintiff maintains that he did not open the flap of the Bugler pouch and the methamphetamine was not in "plain view," negating any purported knowledge of a controlled substance.  Regardless of whether Plaintiff actually did open the package, the Agents could not entertain an honest and strong suspicion that Plaintiff had knowledge of the contents of the Bugler package, which would have revealed the methamphetamine, if it was not visible as Plaintiff has testified.  Probable cause is not established.

The focus is on all the facts in the Agents' possession and whether, in light of these facts, there was probable cause to arrest Garcia, or whether a reasonable officer could have believed there was probable cause to arrest.  This remains in material dispute.

Viewing the evidence in the light most favorable to Plaintiff, he has shown that if the trier of fact believes Plaintiff had no knowledge, he was arrested or detained without probable cause in violation of the Fourth Amendment.  The qualified immunity analysis ends there.  *See Saucier*, 533 U.S. at 201.  There is a genuine issue of material fact.  Defendants' motion for summary adjudication on this claim is DENIED.

Although the parties frame their arguments in terms of "probable cause" for arrest, an alternate analysis exists under *Terry v. Ohio*, 392 U.S. 1 (1968).  A "Terry" stop or investigative

1  detention requires only reasonable suspicion that the detainee is
2  engaged in criminal activity. *Berkemer v. McCarty*, 468 U.S. 420,
3  439 (1984).   "To detain a suspect, a police officer must have
4  reasonable suspicion, or 'specific, articulable facts which,
5  together with objective and reasonable inferences, form the basis
6  for suspecting that the particular person detained is engaged in
7  criminal activity.'"  *United States v. Michael R.*, 90 F.3d 340, 346
8  (9th Cir. 1996) (quoting *United States v. Garcia-Camacho*, 53 F.3d
9  244, 245 (9th Cir. 1995)).    To determine whether reasonable
10 suspicion existed, the court must consider the totality of the
11 circumstances surrounding the stop. *Id.* (citing *United States v.*
12 *Hall*, 974 F.2d 1201, 1204 (9th Cir. 1992)).

13      This involves no different result based on the dispute over
14 the truthfulness of the law enforcement witnesses version of
15 events.  Whether the agents had a reasonable suspicion that Garcia
16 was engaged in criminal activity, i.e., to transport the meth to
17 the jail for Robledo, depends on Plaintiff's knowledge of the
18 presence of the meth, which is totally in dispute.  The Task Force
19 Agents' observations do not create a reasonable suspicion that
20 Plaintiff may have been involved in criminal activity if the agents
21 were truthful.  If the affidavit was false, Plaintiff's detention
22 pending further investigation pursuant to the search warrant was
23 unnecessary.  Summary adjudication on this ground is DENIED.

24
25              **b.   *Unreasonable Detention***

26      Although not addressed in his opposition papers, Plaintiff
27 appeared to raise the issue of unreasonable detention during oral
28 argument on July 27, 2009.

First, although not disputed by Plaintiff, the length of Plaintiff's detention was unreasonable if there was no cause for his detention.   In *Muehler v. Mena*, 544 U.S. 93 (2005), police detained Mena for two to three hours in handcuffs while executing a search warrant.   *Id*. at 1469.   Here, Plaintiff was detained for approximately three hours while agents waited for a special master. Plaintiff was released ninety minutes after the special master arrived.   Nevertheless, the length of Plaintiff's detention was unlawful if Plaintiff's facts are believed.

The level of force used by the agents is not disputed, except if there was no cause for the detention.   Although Plaintiff was handcuffed during the search of his office, he was never physically touched by officers, other than to place him in handcuffs or to remove his handcuffs to let him use the bathroom.   In his December 30, 2008 deposition, Plaintiff conceded that the officers acted reasonably when they detained him:

> Q.   Do you have any facts to show that the defendants used unreasonable force?
>
> A.   No.   They didn't manhandle me, they didn't throw me to the ground.   I wasn't physically harmed in any way...

(Garcia Dep. 195:3-195:7.)

In support of its argument, the County of Merced submitted the deposition of an expert on police procedures, Mr. Miller, who has been a full-time peace officer since 1981.[27]   Mr. Miller testified

---

[27] Portions of Miller's declaration contain inappropriate legal conclusions.   These opinions are inadmissible and not considered. *See United States v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999) (excluding expert testimony offering a legal conclusion); *Aguilar v. International Longshoremen's Union*, 966 F.2d 443, 447 (9th Cir.

1   in his deposition that in his opinion the agents acted reasonably
2   in detaining Garcia and excessive force was not used; that the
3   period of time was not unreasonable because the special master did
4   not arrive until 1940 hours; Deputy Taylor moved the investigation
5   along by taking statements from those named in the warrant; and the
6   search took only 95 minutes once the special master arrived.  (Doc.
7   67-8, ¶ 13.)  Mr. Miller also opined that the officers did not use
8   excessive force as Garcia was purportedly involved in a narcotics
9   smuggling ring.  (Id.)  Miller emphasized that drug offenses are
10  "frequently associated with weapons."  (Id.)

11      Based on the overall dispute in the evidence, summary
12  adjudication is DENIED on Plaintiff's unreasonable detention claim,
13  because the detention was unlawful if the seizure was tainted by a
14  prior illegal search warrant and search.

15

16              c.  *Conclusion*

17      After viewing the entirety of the evidence in Plaintiff's
18  favor, drawing all inferences in his favor, Defendant is not
19  entitled to qualified immunity.  There remains disputed material
20  facts concerning Deputy Taylor's alleged wrongful conduct under the
21  Fourth Amendment.

22      Summary adjudication is DENIED as to Agent Cardwood's motion
23  on Plaintiff's fifth cause of action.

24

25      2.  **District Attorney Gordon Spencer**

26

27  _____

28  1992) (noting matters of law are for the court's determination, not
    that of an expert witness).

1    As best understood, Plaintiff alleges District Attorney

2    Spencer violated his Fourth Amendment rights because he

3    "implemented and created and approved decisions and conduct in

4    obtaining and executing the fraudulent warrant."  It also appears

5    that Plaintiff contends that DA Spencer violated his constitutional

6    rights by offering Mr. Plunkett a reduced sentence for his

7    participation in the sting operation.

8    As to Plaintiff's first contention, although it has not been

9    established that the search warrant obtained from Judge Dougherty

10   on February 6, 2006 was valid, i.e., there was not probable cause

11   to support the search of Plaintiff's automobile, his person, and

12   his law office, to the extent Plaintiff alleges DA Spencer was a

13   participant in the vehicle stop or his detention, it is undisputed

14   that DA Spencer had no role in and was not present during the stop

15   of Plaintiff's vehicle or the search of his office.  Liability is

16   inappropriate under *Torres v. City of Los Angeles*, 548 F.3d 1197.

17   As to Plaintiff's allegations about Plunkett, there is no

18   record evidence, and Plaintiff points to none, demonstrating that

19   Mr. Plunkett received "a reduced jail sentence" based on his

20   participation in the reverse sting operation.  To the contrary, DA

21   Spencer states in his sworn deposition that he did not arrange for

22   a plea agreement or lighter sentence for Robert Plunkett in return

23   for his cooperation in the investigation.  (Doc. 67-12, ¶ 6.)  Mr.

24   Plunkett confirms that he did not receive a deal for his

25   participation in the sting operation.

26   DA Spencer's conduct was "intimately associated with the

27

28

1   judicial phase of the criminal process," he is immune.[28]   This

2   comports with Ninth Circuit's recent decision in *Al-Kidd v.*

3   *Ashcroft*, No. 06-36059, --- F.3d ---, 2009 WL 2836448 (9th Cir.

4   Sept. 4, 2009), as well as *Imbler v. Pachtman*, 424 U.S. 409 (1976)

5   and *KRL v. Moore*, 384 F.3d 1105 (9th Cir. 2004).[29]

6      Summary adjudication is GRANTED in favor of the County of

7   Merced as to Plaintiff's claims against District Attorney Gordon

8   Spencer.

9

10      3.   <u>Plaintiff's § 1983 Claims Against the County of Merced</u>

11      Plaintiff claims that material issues remain as to his *Monell*

12   claim against the County because "Taylor met with Gordon Spencer

13   several times regarding the information he had developed in the

14   investigation, solicited advice from Gordon Spencer about putting

15 ───────────────────

16     [28] All of District Attorney Spencer's conduct involved

17 functions that are protected by absolute immunity.   In his
declaration, Spencer states that in February 2006, he was contacted

18 by agents of the Task Force and informed that a criminal
investigation was underway involving John Garcia allegedly

19 smuggling drugs into the county jail. (Spencer Dec. ¶ 3.)   The
agents told Spencer that they would secure a search warrant if a

20 drug transfer occurred. (Id.)   Spencer advised the agent to
include everything that had occurred in the search warrant

21 affidavit and seek the warrant through Judge Frank Dougherty.  That
ended Spencer's involvement with the sting.   Spencer was not

22 present during the application for the search warrant, the stop of
John Garcia's vehicle, or the search of his office. (Id at 7-8.)

23 Spencer also did not charge Garcia with a crime. (Id at 9.)
Plaintiff presents no evidence or argument that District Attorney

24 Spencer took actions outside his protected functions.

25     [29] As a California district attorney is considered to be a
State officer under most circumstances – i.e., if he was "acting in

26 a prosecutorial capacity," – DA Spencer would also be immune under
the eleventh amendment. *See, e.g., Weiner v. San Diego County*, 210

27 F.3d 1025, 1028 (9th Cir. 2000); *Sanders v. City and County of San*

28 *Francisco*, 226 F. App'x 687, 692-93 (9th Cir. 2007).

the case together for prosecution, and obtained Spencer's approval for the 'reverse sting' operation."   (Doc. 77, 16:11-16:13.) However, not only are Plaintiff's claims inconsistent with the record but, as Defendants note, a California district attorney is considered to be a State, not a County, officer under most circumstances. *Weiner v. San Diego County*, 210 F.3d 1025, 1031 (9th Cir. 2000).   Any statements and/or conduct by District Attorney Spencer cannot be the basis for liability against the County.

As to Plaintiff's remaining Monell allegations, Plaintiff has not presented any evidence establishing the existence of a County policy, custom or practice which would support his claim under § 1983.   Plaintiff has not pointed to any prior instances of Merced County officers omitting material facts from their affidavits in support of search warrants. *See Ulrich v. City and County of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002) (prior instances of similar unconstitutional conduct may establish a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity.")  In addition, Plaintiff has presented no evidence of any written or verbal statement of policy by any County official, who can be said to be an "official policy-maker," encouraging County officers to omit material information from their affidavits in order to secure search warrants for which there would not otherwise be probable cause.[30]

---

[30] To the extent that Garcia argues that municipal liability attaches to the County based upon Taylor or Cardwood allegedly exercising policymaking authority on behalf of the County, this argument is also unpersuasive.  Garcia cites neither facts nor law to support the proposition that a Sheriff's deputy, or a DOJ Special Agent are individuals whose acts represent official County

1    Because Plaintiff has failed to establish a County policy,
2  custom or practice which resulted in the alleged constitutional
3  violation in this case, summary adjudication is GRANTED in favor of
4  Defendant County of Merced on Plaintiff's Monell claim under § 1983.

5

6  C.    State Law Claim - False Arrest/Imprisonment

7    Defendants argue that summary adjudication is warranted on the
8  false arrest/imprisonment claim for the same reasons that it was
9  warranted for Plaintiff's claim under § 1983, i.e, because probable
10 cause existed for the warrant and the search.

11   The tort of false imprisonment is: "(1) the nonconsenual,
12 intentional confinement of a person, (2) without lawful privilege,
13 and (3) for an appreciable period of time, however brief." *Easton*
14 *v. Sutter Coast Hosp.*, 80 Cal. App. 4th 485, 496 (2000). "Under
15 California law, the torts of false arrest and false imprisonment are
16 not separate torts, as false arrest is 'but one way of committing
17 a false imprisonment.'"  *Watts v. County of Sacramento*, 256 F.3d
18 886, 891 (9th Cir. 2001) (quoting *Asgari v. City of Los Angeles*, 15
19 Cal.4th 744 (1997)). "A cause of action for false imprisonment based
20 on unlawful arrest will lie where there was an arrest without
21 process followed by imprisonment." *Watts*, 256 F.3d at 891 (*citing*
22 *City of Newport Beach v. Sasse*, 9 Cal. App. 3d 803 (1970)).

23   In this case, Plaintiff alleges that he was falsely arrested
24 during the vehicle stop prior to the search of his office and that

25

26  policy.   The law in the Ninth Circuit cuts against Plaintiff's
27  litigation position. *See Trevino v. Gates*, 99 F.3d 911, 920 (9th
    Cir. 1996) (concluding that police officers are not officials with
28  final policy-making authority).

1 he was falsely imprisoned based on Agent Cardwood's
2 misrepresentations and omissions in his Oral Affidavit for a Search
3 Warrant.   If there was no probable cause to arrest and detain
4 Plaintiff based on the Task Force Agents' allegedly false
5 observations and reports that Plaintiff allegedly possessed the
6 methamphetamine and returned with it to his office.   There is a
7 genuine issue of material fact that probable cause existed to stop
8 Plaintiff's vehicle on February 6, 2006.

9       The latter claims survive because Plaintiff has establish a
10 genuine issue of fact regarding whether Deputy Taylor knowingly
11 provided misinformation to Judge Dougherty, deliberately omitted
12 material facts, or otherwise engaged in wrongful or bad faith
13 conduct that was actively instrumental in causing the warrant to be
14 issued.

15       Plaintiff's cause of action for false imprisonment/arrest is
16 not subject to summary judgment as the existence of probable cause
17 is in dispute.[31]   *See Blankenhorn v. City of Orange*, 485 F.3d 463,
18 486-87 (9th Cir. 2007).   Whether probable cause existed for Deputy
19 Taylor's stop of Plaintiff and for the search of his law office is
20 a jury issue.   The false imprisonment/arrest claims against
21 Defendants cannot be determined as a matter of law.

22       Summary judgment is DENIED as to Plaintiff's state law claims
23
24

25       [31] In California, false arrest is a species of the tort of
false imprisonment. *Collins v. City & County of San Francisco*, 50
26 Cal. App. 3d 671 (1975) ("False arrest is but one way of committing
a false imprisonment."). "False imprisonment is 'the nonconsensual,
27 intentional confinement of a person, without lawful privilege, for
an appreciable length of time, however short.'" *George v. City of*
28 *Long Beach*, 973 F.2d 706, 710 (9th Cir. 1992).

49

1  for false imprisonment/arrest.

2

3                        V.    Conclusion

4       For the reasons discussed above:

5       1.    The motion for summary adjudication on the first cause of

6  action for assault and the second cause of action for battery is

7  GRANTED.

8       2.    The motion for summary adjudication on the conspiracy

9  allegations contained in Plaintiff's Fifth Amended Complaint is

10 GRANTED.

11      3.    The motion for summary adjudication on Plaintiff's

12 allegations that Deputy Taylor violated his Fourth Amendment rights

13 by conducting a reverse sting operation on February 6, 2006 is

14 GRANTED .

15      4.    The motion for summary adjudication on the Fourth

16 Amendment claim for judicial deception (*Franks* claim) is DENIED.

17      5.    The motion for summary adjudication on the Fourth

18 Amendment claim for unreasonable arrest and detention under the

19 Fourth Amendment Claim is DENIED.

20      6.    The motion for Summary adjudication on Plaintiff's claim

21 against District Attorney Gordon Spencer is GRANTED.

22      7.    The motion for summary adjudication on Plaintiff's *Monell*

23 claim against the County of Merced is GRANTED.

24      8.    The motion for summary adjudication on the related state

25 law claim for false arrest/imprisonment is DENIED.

26

27      Consistent with Rule 56(d)(1), both parties shall have five (5)

28 days following service of this decision to file a list of material

                                 50

facts which each party believes are not genuinely at issue for purposes of trial. If separately filed by the parties, these lists shall not exceed five pages. To the extent practicable, the parties should meet and confer to determine whether and to what extent any material facts are agreed upon for purposes of trial. Agreed upon facts should be listed in a joint filing. Any such joint filing has no page limitation.

Plaintiff shall submit a form of order consistent with, and within five (5) days following electronic service of, this memorandum decision.

IT IS SO ORDERED.

Dated:    September 25, 2009              /s/ Oliver W. Wanger
                                    UNITED STATES DISTRICT JUDGE